In re DIRECT SATELLITE COMMUNI-
CATIONS, INC., Debtor.

DECHERT PRICE &
RHOADS, Plaintiff,

v.

DIRECT SATELLITE COMMUNICA-
TIONS, INC., Defendant and
Counterclaim–Plaintiff,

v.

DECHERT PRICE & RHOADS,
Counterclaim–Defendant and
Third–Party Plaintiff,

v.

Errett L. CARPENTER, and Christopher
Illick, and Thomas K. McNeil, and Kev-
in P. O'Brien, Third–Party Defendants.

Bankruptcy No. 85–05571S.
Adv. No. 87–1071S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 6, 1989.

Spencer Ervin, Jr., Philadelphia, Pa., for debtor.

Louis W. Fryman, Philadelphia, Pa., for counterclaim-defendant and third party plaintiff.

Thomas M. Kittredge, Philadelphia, Pa., for additional defendants O'Brien and Illick.

Thomas K. McNeil, Errett L. Carpenter, Cherry Hill, N.J., for third-party defendant.

Dechert, Price & Rhoads, Philadelphia, Pa., pro se.

DAVID A. SCHOLL, Bankruptcy Judge.

## A. INTRODUCTION

One redeeming feature of hearing a long trial is that the court emerges from the completion of proceedings totally immersed in the underlying facts from a number of vantage points and, consequently, may be quite clear about what a just result of the controversy should be. By bankruptcy court standards, this proceeding consumed a long period—eight mostly very full trial dates between September 26, 1988, and October 18, 1988. At its conclusion, we were firmly convinced that the proceeding could be effectively bifurcated into two separate "cases," in one of which the claims of the Debtor and Counterclaim–Plaintiff, DIRECT SATELLITE COMMUNICATIONS, INC., (hereinafter referred to as "the Debtor") definitely had merit and in the other of which it definitely did not.

Pervading this proceeding is the totally inappropriate behavior of two actors, Third–Party Defendant ERRETT L. CARPENTER (hereinafter "Carpenter"), and LOUIS N. MARKS, ESQUIRE (hereinafter "Marks"), the former partner of the Counterclaim–Defendant, the law firm of DECHERT, PRICE, AND RHOADS (hereinafter "Dechert"), who was Dechert's lead counsel in representation of the Debtor from September, 1983, until Dechert's discharge on June 21, 1985. Carpenter, by a series of sharp dealings and/or outright frauds and falsehoods, concealed his failures to pay certain proceeds from sales of stock to the Debtor, leading in large part to its financial collapse. Marks engineered a despicable scheme whereby he covertly received substantial compensation for his personal benefit, in addition to that earned by Dechert, from the Debtor. However, we conclude that Carpenter and Marks did not perpetrate their wrongdoings in tandem, but were operating entirely independently from each other. The Debtor's target, moreover, is neither Carpenter nor Marks, but Dechert, presumably because Dechert's financial pockets are larger and/or more accessible than those of Carpenter or Marks.

We conclude that Dechert is responsible for the wrongdoings of Marks, since he was acting within the ordinary course of partnership business in his actions and because its response to discovery of his conduct was inappropriately mild and appears to lack, even to this day, the appropriate remorse. Marks' conduct created an intolerable actual conflict of interests, which may have debilitated Dechert's representation of the Debtor at a crucial juncture in its history. Therefore, the traditional remedy consequence for counsel which acts in a situation where its interests are in conflict results, i.e., forfeiture of all of Dechert's fees throughout its engagement with the Debtor.

However, we decline to conclude that Dechert is responsible for the wrongdoings of Carpenter. The basis for such a claim are, essentially, contentions that Dechert engaged in malpractice in failing to uncover Carpenter's perfidious actions prior to the time that they came to light and that its attorneys failed to act appropriately after it did come to light. We believe that the Debtor failed to produce the requisite corporate-law expert evidence of the duties of care and breaches of those duties which are necessary elements of such claims. Furthermore, we find that the Debtor failed to show the causative link between any breaches of these duties and its claimed elements of damages, particularly as to the largest element of damages claimed, i.e., millions of dollars for the consequential loss of the Debtor's valuable

subsidiary. Therefore, any relief as to these claims of the Debtor is denied.

## B. PROCEDURAL HISTORY

The underlying Chapter 11 bankruptcy of the Debtor was filed on December 30, 1985, simultaneously with the filing of a similar case for the Debtor's then-wholly-owned subsidiary, Marquee Television Network, Inc. (hereinafter "Marquee"), at Bankr. No. 85–05572K. After about a year of turmoil, a negotiated Plan of Reorganization of the Debtor was confirmed by this Court on May 28, 1987.

The genesis of this adversary proceeding was, technically, a rather harmless-looking Proof of Claim (No. 24) filed by Dechert for alleged unpaid pre-petition services and costs in the amount of $38,835.45 on March 20, 1986. However, the matter did not achieve adversary proceeding stature until December 24, 1987, when the Debtor filed a Complaint in the nature of a Counterclaim to Dechert's Proof of Claim. Therein, the Debtor not only contested Dechert's claim, but also sought millions of dollars of damages from Dechert.

We have issued three published Memoranda arising from the pre-trial gyrations in this matter, reported at 91 B.R. 7 (September 23, 1988), 91 B.R. 5 (June 30, 1988), and 86 B.R. 390 (February 29, 1988). The first of these arose in our denial of the Dechert's motion to dismiss this proceeding in its entirety based upon, *inter alia,* the pendency of a parallel, prior state court proceeding concerning the same facts, and upon the failure of the Debtor to join Carpenter, allegedly an indispensable party, in this action.[1]

The second arose when Dechert responded to our first decision, in which we suggested that Dechert could avoid any problem of impairment of its interests from the absence of Carpenter by simply joining him as a third-party defendant, by joining not only Carpenter, but also joining, as third-party defendants, three other parties, former company officers CHRISTOPHER D. ILLICK (hereinafter "Illick") and KEVIN P. O'BRIEN (hereinafter "O'Brien") and former director and present principal of the reorganized debtor, THOMAS K. McNEIL (hereinafter "McNeil"). Counsel for the Debtor, Spencer Ervin, Jr. (hereinafter "Ervin"), then also representing Illick, O'Brien, and McNeil, responded by moving to dismiss the claims against these parties on the ground that they were not related to the Debtor's bankruptcy case. We denied that motion also, concluding that it was appropriate to exercise our pendent jurisdiction over those claims. 91 B.R. at 6–7.

The final round of motions was fueled by Dechert's motion to disqualify Ervin from representing any parties, due to his previous involvement in the controversy and alleged potential conflicts between the interests of the Debtor and the third-party defendants. On August 15, 1988, we resolved that controversy by disqualifying Ervin from representing the third-party defendants only. We also scheduled the trial to commence on September 19, 1988, later moved back to September 26, 1988.

Thomas Kittredge, Esquire (hereinafter "Kittredge"), who had entered his appearance for O'Brien on July 1, 1988, and thereafter entered his appearance for Illick and McNeil on September 8, 1988, instigated the last controversy by informing us, in a pre-trial telephone conference of September 15, 1988, that he was pressing a request by O'Brien for a jury trial, the very request for which had previously been unknown to us. In our last pre-trial Memorandum, filed on virtually the eve of trial, we granted Dechert's motion to strike O'Brien's jury demand, on the ground that a counterclaim to a proof of claim, pursuant to 28

---

1. Joinder of any parties not claimants in the Debtor's bankruptcy could have resulted in potential jurisdictional problems, as the Complaint, as conceived, fell nicely into the category of not only a proceeding related to this bankruptcy case, but also as a "counterclaim ... against [a] person ... filing claims against the estate," and hence as a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(C). See page 514–15 *infra.* However, as our later Opinion of June 30, 1988, pointed out, it may have been conceivable for us to exercise our pendent jurisdiction to hear claims against Carpenter or Marks or any of the other parties ultimately joined hereto.

U.S.C. § 157(b)(2)(C), such as the matter in issue here, was not properly classifiable as an action at law, and hence no right to a jury trial arose. 91 B.R. at 8–9. *Compare In re Jackson*, 90 B.R. 126, 133–35 (Bankr. E.D.Pa.1988).

The trial began as scheduled on September 26, 1988, and was resumed on October 3, October 7, October 12 (part-day), October 13 (part-day), October 14, October 17, and October 18, 1988 (part-day). At the outset, Kittredge withdrew his appearance for McNeil, and McNeil and Carpenter both appeared and occasionally participated in the trial *pro se*. On October 25, 1988, we ruled on admission of proffered exhibits. Thereafter, we also issued an Order contemplating the filings of Findings of Fact and Legal Argument by all parties and thereafter an oral argument in lieu of Reply Briefs. This process was consummated on January 18, 1989, when we heard oral arguments. Pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), we are obliged to present our result in the form of Findings of Fact and Conclusions of Law. We do so, although the latter are presented as headnotes in a portion hereof entitled Conclusions of Law/Discussion.

## C. FINDINGS OF FACT

1. The Debtor is a Delaware corporation which was founded in July, 1980, by Sol E. Zubrow (hereinafter "Zubrow") and Carpenter. Its projected business was to provide certain private television and communication system services, *i.e.*, television cable access systems to high density commercial settings such as hotels, motels, and residential real estate developments. Zubrow was the visionary who conceived the concept of the Debtor; Carpenter was an accountant who provided financial know-how; and these parties were joined in June, 1982, by George E. Harris (hereinafter "Harris"), who provided technical expertise in the television-cable industry. Zubrow, Carpenter, and Harris formed what was known as and will be referred to hereinafter as "the Founders Group."

2. On October 31, 1983, shortly after hiring Dechert as the Debtor's counsel, the lead counsel being Marks, then a Dechert partner, the Founders Group entered into a Shareholders Agreement, prepared by Marks. The Shareholders Agreement provided, *inter alia*, that each member of the Founders Group mutually agreed to offer all of each other's stock to the other shareholders before selling same to any third party at a certain price per share as calculated therein, and to pay for all shares in full as calculated elsewhere therein. This Agreement was never rescinded and was arguably in effect at all times thereafter.

3. On or about November 15, 1983, the Debtor, in order to raise needed capital, sold 35,833 shares of its common stock to Guggenheim Brothers and certain of its affiliates, including the English Association, Inc. and certain other institutional investors in the United Kingdom (collectively referred to as "the Purchasers Group"). The aggregate purchase price was $2,000,-000, or $60 per share, pursuant to a written agreement with the Founders Group containing mutual restrictions on sales of stock by either group.

4. The par value of the Debtor's stock was, apparently at all relevant times, recited as ten (10¢) cents per share on the stock certificates issued.

5. In June, 1984, needing additional cash, the Debtor, per Marks, negotiated for a $10,000,000 line of credit from Fidelity Bank (hereinafter "Fidelity"). Dechert and, specifically, Marks was also representing Fidelity at the time.

6. In September, 1984, Zubrow, whose shortcomings as an administrator were becoming manifest, was replaced with Carpenter as the Debtor's chief executive officer. Zubrow remained as chairman of the company's board of directors. Although capital was still needed, the Purchasers Group, per McNeil, indicated that it would not invest additional monies in the Debtor until after a member of the Founders Group did so.

7. Having at that time substantial financial resources from the family of his (now-ex)-wife, Jane Schiff Carpenter (here-

inafter "Jane"), and being the only Founders Group member in a position to do so, Carpenter entered into a Stock Purchase Agreement (hereinafter the "Stock Agreement") and an Option Agreement (hereinafter the "Option") with the Debtor on November 12, 1984.

8. Pursuant to the Stock Agreement, Carpenter agreed to immediately purchase 50,000 shares of the Debtor's common stock for $500,000, or $10.00 a share. Pursuant to the Option, Carpenter obtained the right to purchase an additional 150,000 shares of the Debtor's common stock at the same price. In exercise of the Option, Carpenter, on November 12, 1984, delivered a promissory note to the Debtor, one-third of which was payable on December 12, 1984, the second third of which was payable on January 12, 1985, and the last third of which was payable on February 12, 1985.

9. In January, 1985, Carpenter travelled to England to solicit sales of his stock in the Debtor to the Purchasers Group at $15.00 a share, or a total price of $900,000, taking with him a "letter of introduction" drafted by Marks.

10. The Purchasers Group assumed, due to Carpenter's oral representations, that $5.00 out of every share of stock sold at $15.00 per share (or a total of $300,000, since this was the amount by which the sale price exceeded Carpenter's purchase price), would be put into a share premium account for the benefit of the Debtor. However, the letter drafted by Marks did not expressly so provide.

11. At this time, Carpenter apparently began having domestic problems with Jane and his flow of funds from Jane's family was impeded. Presumably as a result of his personal cash-flow problems, Carpenter engineered a series of transactions which resulted in his only paying $750,000 towards the purchase of his stock pursuant to the Option, and utilizing the entire $900,000 received from the Purchasers Group towards the $750,000 that he in fact did pay. Thus, Carpenter did not place any of the funds received from the Purchasers Group in a share premium account, as that group assumed he would do, nor did he

honor the provisions of the Shareholders Agreement which apparently required full payment for all stock purchased.

12. Dechert nevertheless issued the certificates of stock to Carpenter which he was to have purchased pursuant to the Option, believing that he had paid for it. On at least two instances in March, 1985, Zubrow raised to Marks, the question of whether Carpenter had in fact paid for the stock. However, these complaints from Zubrow were disregarded, as they were not voiced consistently and Zubrow was rather reasonably thought by Dechert to be merely a malcontent due to his reduced role with the Debtor. Neither Marks nor any other Dechert attorney working on the engagement informed the Debtor's Board that there was a question as to whether Carpenter had paid for his stock.

13. On January 10, 1985, the Debtor signed an acquisition agreement to purchase Marquee, which at that time was operating a one-channel cable television (MDS) system in commercial and residential locations in the Washington, D.C. area. Although Marquee had been very successful to date, it was recognized that its technology was obsolete because of the potential availability of multi-channel television cable systems, and that it would ultimately have to be converted to a different system to remain profitable.

14. The total purchase price for Marquee was $10,000,000, but the agreement required that, at closing, Marquee have cash in the bank of $3,000,000, so that the net acquisition price was actually only $7,000,000. The Debtor was attracted to this transaction because it would allow the Debtor to receive Marquee's operating income, which had historically been in excess of $2,000,000 a year, and because it hoped that it would be able to convert Marquee to a multi-channel system, such as it was operating in other locations, and render Marquee highly profitable in the future.

15. This purchase was financed with a restatement of the Debtor's previous loan with Fidelity and participation in the loan by Industrial Valley Bank & Trust Co. (hereinafter "IVB"). The emerging loan

from Fidelity and IVB was to be in the amount of $11,000,000. As part of this deal, Carpenter also agreed to personally borrow $1,000,000 from Fidelity which he would lend to the Debtor in exchange for its promissory note in that amount.

16. Dechert, as counsel for the Debtor, issued an opinion to Fidelity and IVB in connection with the closing of the loan and the Marquee closing that all of the Debtor's issued stock was fully paid and non-assessable, which it believed to be the case, although, in fact, Carpenter had not fully paid for his stock.

17. On March 25 and 26, 1985, the transaction with Fidelity and IVB closed. At the loan closing, Carpenter pledged to Fidelity, as security for his loan, all of the shares of the Debtor issued to him despite restrictions in the Shareholders Agreement prohibiting such a pledge. Dechert did not note Carpenter's action and never brought it to the attention of the Debtor's Board.

18. On April 4, 1985, the Marquee purchase was closed in Washington, D.C., and the funds were disbursed. During the Marquee closing, Marks privately advised Carpenter that he expected to personally receive compensation of $90,000 annually, plus use of an automobile, stock-purchase options in the Debtor, and certain other benefits, for his role in obtaining Fidelity's participation in the loan transaction, effective January 1, 1985. Marks represented that this arrangement had previously been made with him on behalf of the Debtor by Zubrow.

19. In accordance with this arrangement, Carpenter, shortly thereafter, paid Marks $30,000 for the first four installments under the consulting scheme, and continued to make payments thereafter. Marks informed no one at Dechert, including the two other Dechert lawyers working on this matter, partner Richard Seltzer (hereinafter "Seltzer") and associate Craig Lewis (hereinafter "Lewis"), about this arrangement.

20. In December, 1984, the Debtor had hired Arthur Andersen & Co. (hereinafter "Andersen"), as its auditor. On May 16, 1985, Marks spoke to O'Brien (who had been hired as the Debtor's chief financial officer in March, 1985) and Illick (who was its vice president in charge of operations from January to July, 1985) to determine whether Andersen had delivered its certified financial statements to Fidelity/IVB as required by the documents in the loan transaction. Marks then learned that these statements were not ready because of Andersen's discovery that Carpenter had not made all of the cash payments for his stock.

21. After confirming this report with Andersen, Marks called Carpenter in Denver, Colorado, on May 16, 1985, and told him he would have to return to Philadelphia to resolve the matter of his stock payments. Carpenter thereupon returned to Philadelphia on Monday, May 20, 1985.

22. After a meeting with Carpenter on May 20, 1985, Marks prepared certain certificates which set forth Carpenter's characterization of the events surrounding his stock purchases and payments which featured an attempt by Carpenter to claim that he had made the payments and that Andersen misunderstood some aspects of the transaction. Marks requested both Carpenter and O'Brien, as the Debtor's chief financial officer, to sign the certificates if they were accurate, but O'Brien declined to do so, even though he realized it would jeopardize his position, because he was uncertain that its contents were accurate. Carpenter never signed them either.

23. By May 22, 1985, Carpenter admitted that he had not made the payments, but offered to cure this failure by either releasing the Debtor's debt to him under his personal $1,000,000 loan to it or by making payment with a check.

24. On May 21, 1985, Dechert prepared a notice of a special board of directors meeting to be held on May 28, 1985, which it claimed was the first available date for a meeting following the Memorial Day weekend. At that meeting, Dechert distributed a memorandum concerning Carpenter's non-payment for his stock which described the proposal for utilizing the release as a means of resolving the loan delinquency. McNeil and others took the position that

Carpenter could not extinguish his cash obligations to the company by releasing $750,000 of the company's debt to him and this resolution was not accepted. Also, an audit committee of the Debtor's board was formed at that meeting.

25. On June 3, 1985, the audit committee ascertained that Carpenter's check had not cleared, and, shortly thereafter, Carpenter advised that he had stopped payment on the check for $750,000 in any event.

26. On or about the date of the May 28, 1985, meeting, the personal consulting arrangement which Marks had negotiated with Carpenter on April 4, 1985, came to light, by what means neither Marks nor any other witness was able to recite. Marks, on or about June 12, 1985, informed Dechert's policy committee about this arrangement, and he also informed the Debtor's audit committee about it on June 3, 1985.

27. Dechert's policy committee directed that Marks immediately repay the cash which he had received pursuant to the arrangement, which he did. However, there were other benefits received by Marks pursuant to the arrangement, such as the free use of an automobile and a trip for his family to Disney World, for which Marks did not recompense the Debtor. Also, Dechert continued to allow Marks to retain his role as its lead counsel for the Debtor.

28. In the meantime, a board meeting of the Debtor was held on June 11, 1985, and was attended by three Dechert partners, Marks, Seltzer, and Herbert R. Goodrich, Jr. Also present were numerous other counsel for other board members. At that meeting, Carpenter attempted to assert his position as the majority shareholder of the Debtor by removing Zubrow's son as a director and replacing him with Jane. Also present at the meeting was board member Herbert Schiff (hereinafter "Schiff"), Jane's wealthy father, who asked the Dechert partners whether Carpenter had a right to exercise the powers of a shareholder, since he had not paid in full for his stock. The Dechert partners, as they had previously stated would be their

position if asked to do so, declined to give an opinion.

29. On June 21, 1985, Dechert was dismissed as the Debtor's counsel and was ultimately replaced by Wolf, Block, Schorr, and Solis–Cohen (hereinafter "Wolf"), which firm has represented the Debtor in the underlying bankruptcy proceeding to date.

30. By late June, 1985, a majority of the Debtor's board members effected a "political solution" to the dispute concerning Carpenter's stock ownership and cash payments rather than engaging in litigation over these issues. An executive committee consisting of two members of the Purchasers Group, McNeil and John Trask on one hand, and Jane and Schiff, both of whom had been assigned Carpenter's interests, on the other hand, attempted to manage the company. Although they administered the corporation in orderly fashion thereafter, the board never resolved the deadlock.

31. In early December, 1985, McNeil went to London to meet with other members of the Purchasers Group to attempt to obtain further capital to restructure the Debtor pursuant to a consultive report from Community Equity Associates (hereinafter "CEA"). This report suggested selling the Debtor's assets in several more remote areas, such as Florida and California, and concentrating on converting the technology of Marquee from MDS to a technology (SMATV), which would permit its subscribers to view several channels. McNeil testified that the board deadlock was a substantial factor in the failure of the Debtor to obtain capital or restructure itself at that time.

32. Later that month, on December 30, 1985, the Debtor was forced to file for bankruptcy for itself and Marquee when the Debtor was unable to pay suppliers of necessary services to Marquee.

33. Subsequent to the filing, in the summer of 1986, McNeil offered to either sell his stock to the Schiff interests or have them sell their stock to him for nominal consideration in order to break the board deadline. The Schiff interests decided to sell to McNeil, and he thereby acquired the

voting rights to over ninety (90%) percent of the company's stock. In November, 1986, McNeil became chief executive officer of the Debtor.

34. In June, 1987, under the Debtor's Plan of Reorganization, Cable Network Corporation (hereinafter "CNC"), owned by McNeil, acquired one hundred (100%) percent of the Debtor's stock for $1,500,000 which McNeil had borrowed on behalf of CNC. The Plan also featured the relinquishment of Marquee to Fidelity, which Fidelity liquidated shortly thereafter by selling Marquee to one of its suppliers for $5,800,000.

35. By September, 1988, following the CEA work-plan, McNeil had liquidated a number of the Debtor's holdings for a total sale price of approximately $4,500,000, which appears to have yielded the Debtor a considerable profit. At one point, the Debtor assigned all of its rights in this litigation to McNeil personally, but McNeil testified that he had reassigned those interests back to the Debtor.

36. The Debtor contends that the value of Marquee at present is between $15 million and $17 million. The Debtor, in this suit, attributes its loss of Marquee to the malpractice of Dechert, and it claims that the damages to the Debtor from the loss of Marquee exceeded $5 million.

37. The only expert witness which the Debtor called on the issue of Dechert's liability (as opposed to the testimony regarding valuation of Marquee, which was an element of damages), was Monroe Freedman, a Professor at Hofstra University Law School who has been recognized as an expert in legal ethics for over twenty (20) years. Professor Freedman articulated several potential conflicts of interests in Dechert's representation of the Debtor, including its simultaneous representation of the Debtor and Fidelity and the numerous areas of potential conflict created by the personal consulting arrangement that Marks established with the Debtor. Professor Freedman opined that these conflicts could be ameliorated only by complete disclosure of each instance of dual representation to all interested parties and agreement from all interested parties that Dechert nevertheless should continue as their counsel. While not addressing Dechert's duties from other than an ethical standpoint, he expressed, inter alia, an opinion that Dechert had been slow in informing the Debtor's Board of its knowledge of Carpenter's nonpayments after May 16, 1985, and an opinion that, if Dechert was unwilling to provide an opinion as to Carpenter's rights to vote the stock on June 11, 1985, meeting, it should have explained its reasons for not doing so. Professor Freedman stated that three types of damages could be appropriate in the case asserting improperly disclosed conflicts of interests: damages for injuries proximately caused by the breach, loss of entitlement to compensation, and punitive damages.

38. Dechert also called an expert on legal ethics, Curtis Reitz of the University of Pennsylvania Law School, who heads that institution's specialized first-year course on "professionalism," and an expert on the corporate law of Delaware, Edmund Carpenter, Esquire (no relation to Errett!) (referred to hereinafter as "Mr. Carpenter"). Professor Reitz emphasized, inter alia, that consent could eliminate any potential conflict. Mr. Carpenter opined that, since Carpenter had paid an amount at least equal to par value for the stock which he purchased, he may have been able to maintain that he was entitled to vote it, although Mr. Carpenter conceded that the presence of the Shareholders Agreement among the Founders Group members may have weakened that argument.

39. The most spirited testimony was provided by Seltzer, who vigorously denied any suggestion that Dechert had done anything wrong throughout this matter. At one memorable point, Seltzer described the attorneys present at the June 11, 1985, meeting who criticized Dechert as "the biggest bag of sleaze I've seen in my life," despite that this gathering included Ervin and a highly-regarded partner of Kittredge.

40. Throughout the hearing and even in the opening statements of his oral argument on January 18, 1989, Dechert's counsel, Louis W. Fryman, Esquire (hereinafter

"Fryman"), obviously expressing the feelings of his client, contended, with a rather annoying degree of self-righteousness, that none of Dechert's actions, as a firm, were improper in any way and that its response to Marks' personal consulting arrangement, which it characterized as merely contrary to the "culture" of the firm, did not in any way justify criticism.

41. The parties stipulated, as embodied in a letter of Fryman to this court of January 25, 1989, in response to our request for same at the oral argument of January 18, 1989, that the total legal fees paid by the Debtor to Dechert from September, 1983, through June 21, 1985, were $368,087.35.

## D. CONCLUSIONS OF LAW/DISCUSSION

1. *This court has jurisdiction to determine this matter, as it is a "Core Proceeding" pursuant to 28 U.S.C. § 157(b)(2)(C)*

The parties apparently agree, and we previously stated in each of our prior Memoranda, 91 B.R. at 8, 91 B.R. at 6, 86 B.R. at 391, that the instant proceeding is properly classified as a counterclaim to a proof of claim, and hence is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(C). Bankruptcy judges may hear and determine, *i.e.*, decide and enter a final judgment in, core proceedings. 28 U.S.C. § 157(b)(1). *See, e.g., In re Windsor Communications Group, Inc.*, 67 B.R. 692, 693 (Bankr.E.D. Pa.1986). We are therefore empowered to finally decide this matter.

2. *The debtor has not established the validity of any of its claims of malpractice against Dechert*

a. In Order to Prevail in a Legal Malpractice Case, Under Pennsylvania Law, the Client Bears the Burden of Proving, By a Preponderance of the Evidence, Each of Three Elements: (1) The Duty of the Attorney to the Client; (2) A Breach of that Duty; and (3) That the Breach was a Substantial Factor in Causing Damages to the Client.

The citations of both parties to many Pennsylvania cases implies an agreement that this case is governed by the law of Pennsylvania. Indeed, as the City of Philadelphia, Pennsylvania, was the situs of the Debtor's home office and the office of the Dechert attorneys who were counselling the Debtor, it seems apparent that the interests and significant contacts of Pennsylvania with this controversy outweigh those of any other jurisdiction. *See, e.g., Jones & Laughlin Steel Corp. v. Johns–Manville Sales Corp.*, 626 F.2d 280, 283–84 (3d Cir.1980); and *In re Koresko*, 91 B.R. 689, 694 n. 1 (Bankr.E.D.Pa.1988). Pennsylvania law therefore must be applied.

The elements of a claim of malpractice, under Pennsylvania law, are as follows:

1. The employment of the attorney or other basis for duty;

2. The failure of the attorney to exercise ordinary skill and knowledge; and

3. That such negligence was the proximate cause of damage to the plaintiff. *Schenkel v. Monheit*, 266 Pa.Super. 396, 399, 405 A.2d 493, 494 (1979). *Accord Gans v. Gray*, 612 F.Supp. 608, 615 (E.D. Pa.1985); *Duke & Co. v. Anderson*, 275 Pa.Super. 65, 71, 418 A.2d 613, 616 (1980). *Trice v. Mozenter*, 356 Pa.Super. 510, 515 A.2d 10, 13 (1986).

*Curran v. Stradley, Ronon, Stevens & Young*, 361 Pa.Super. 17, 24, 521 A.2d 451, 454 (1987). *Accord, e.g., Gans v. Mundy*, 762 F.2d 338, 342 (3d Cir.1985); *Zimmer Paper Products Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 93–94 (3d Cir. 1985); and *Storm v. Golden*, 371 Pa.Super. 368, 374–75, 538 A.2d 61, 64 (1988).

As in any malpractice case, a client bringing such a suit against an attorney must prove all of the requisite elements by a preponderance of the evidence. *See Hamil v. Bashline*, 481 Pa. 256, 264–65, 392 A.2d 1280, 1284–85 (1978); *Trice, supra*, 356 Pa.Super. at 517, 515 F.2d at 13–14; and *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 118, 464 A.2d 1243, 1257 (1983).

The last element, "proximate cause," is a term of art under Pennsylvania law. Proof of this element "requires not only ' "but

for" causation in fact' but also 'that the conduct be a "substantial factor" in bringing about the harm.' *Klages v. General Ordnance Equip. Co.*, 240 Pa.Super. 356, 373, 367 A.2d 304, 313 (1976)." *National Controls Corp. v. National Semiconductor Corp.*, 833 F.2d 491, 496 (3d Cir.1987). *See also Whitner v. Lojeski*, 437 Pa. 448, 454–62, 263 A.2d 889, 892–96 (1970); and *Takach v. B.M. Root Co.*, 279 Pa.Super. 167, 170–74, 420 A.2d 1084, 1086–88 (1980). *Compare Miami International Realty, Inc. v. Paynter*, 841 F.2d 348, 350 (10th Cir.1988) (this case, relied upon by the Debtor, was decided under Colorado law, which apparently requires only "but for" causation in a malpractice case). Thus, under Pennsylvania law, a malpractice claim will fail when the client's alleged loss is "speculative," *Mariscotti v. Tinari*, 335 Pa.Super. 599, 601, 485 A.2d 56, 57 (1984), or "too conjectural or remote," *Pashak v. Barish*, 303 Pa.Super. 559, 561, 450 A.2d 67, 68 (1982). *See generally Gans v. Gray, supra*, 612 F.Supp. at 615–16.

b. Expert Testimony Supportive of the Elements of a Legal Malpractice Action is Generally Required Under Pennsylvania Law.

Several cases, applying Pennsylvania law, have considered the issue of whether expert testimony is always required to establish each of the three elements of a claim of malpractice. The Pennsylvania Supreme Court has not directly addressed this issue, although it has held that expert testimony is an absolute prerequisite in other types of malpractice actions, on the theory that "the ultimate determinations lie beyond the knowledge and expertise of the average lay person," *Hamil, supra*, 481 Pa. at 266, 392 A.2d at 1285 (medical malpractice case), and hence, "the law requires that expert testimony be employed ... bearing on whether or not the defendant's conduct was negligent [and] ... to establish that the injury did, with a reasonable degree of ... certainty, stem from the negligent act alleged." 481 Pa. at 267, 392 A.2d at 1285. *See also, e.g., Powell v. Risser*, 375 Pa. 60, 65, 99 A.2d 454, 456 (1953); and *Bierstein v. Whitman*, 360 Pa.

537, 541, 62 A.2d 843, 845 (1949) (suggesting that the requirement of expert testimony applies to all malpractice actions against members of all professions).

Conceivably, there could be room for a distinction between legal malpractice and other forms of malpractice, particularly in cases tried before a judge, because the judge presumably has legal expertise, but not expertise in other professions, and can, in effect, take judicial notice of legal malpractice. *But see* Federal Rule of Evidence 201(b) (court may only take judicial notice of facts "generally known" within the court's jurisdictional district or "capable of accurate and ready determination to sources whose accuracy cannot reasonably be questioned," which categories would not appear to include a judge's "legal expertise").

Both the Third Circuit Court of Appeals and the Pennsylvania Superior Court have taken turns at predicting what the Pennsylvania Supreme Court would hold if squarely faced with the issue of the prerequisite of expert testimony in a legal malpractice case. The Court of Appeals concluded, in *Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474, 481 (3d Cir.1979), that

expert testimony is required in bench trials of legal malpractice claims except where the matter under investigation is so simple, and the lack of skill so obvious, as to be within the range of the ordinary experience and comprehension of even non-professional persons.

*Accord, Gans v. Mundy*, 762 F.2d at 346 (*Lentino* rule reaffirmed in context of a holding that a defendant movant for summary judgment need not introduce expert testimony in order to prevail).

In *Storm, supra*, 371 Pa.Super. at 375–78, 538 A.2d at 64–65, the Superior Court also addresses this topic. It concludes, 371 Pa.Super. at 377, 538 A.2d at 65, that

the determination of whether expert evidence is required or not will turn on whether the issue of negligence in the particular case is one which is sufficiently clear so as to be determinable by laypersons or concluded as a matter of law, or whether the alleged breach of duty

involves too complex a legal issue so as to warrant explication by expert evidence.

The court held that, in the case at bar, which involved a rather vague claim that an attorney hired to represent a client-seller at a real estate closing of her home negligently allowed a "friend" who was assisting the client to abscond with the sale proceeds, 371 Pa.Super. at 371–72, 538 A.2d at 62, expert testimony was needed, because a real-estate closing was apparently felt to be inherently technical in nature. 371 Pa.Super. at 377, 538 A.2d at 65.

The tests developed in *Lentino* and *Storm* appear totally consistent, and suggest that, under Pennsylvania law, expert testimony is required as an element of proof in any but the very simplest malpractice cases.

   c. The Malpractice Claims in the Instant Proceeding are Extremely Complex; Expert Testimony on all Elements of These Claims was Therefore Required.

■ The most comprehensive statement of the nature of the malpractice claims of the Debtor here is articulated in the Post–Trial Brief on Behalf of Direct Satellite Communications, Inc., at 4–5, where it is stated that Dechert's "acts of malpractice" include "at least" the following: [2]

1. The Marks consulting scheme whereby he was to receive $90,000 per year, a Cadillac, stock options plus other fringe benefits;

2. The issuance in February or March, 1985 of 50,000 shares of stock to Carpenter when it was evident that he had not paid the $500,000 cash;

3. The failure to cancel the 50,000 shares of stock issued to Carpenter after Zubrow notified Marks that Carpenter had not paid for it;

4. The failure to cancel the 75,000 shares of Carpenter stock in May 1985, after Arthur Andersen notified Dechert that Carpenter had not paid

for it, and the failure promptly to notify the Board about the non-payment;

5. The participation of Dechert in Carpenter's attempt to "pay" for his stock by release of an obligation not yet due;

6. The failure of Dechert to advise the Board on May 28, 1985, that it could, in the alternative, cancel Carpenter's shares or demand immediate payment;

7. The refusal of Dechert on June 11, 1985, to advise the Board as requested on Carpenter's right to vote the shares wrongfully issued;

8. The preparation of the contract permitting Carpenter to divert from DirectSat $300,000 of the English investor' stock payment;

9. The failure to obtain the informed consent of DirectSat to Dechert's simultaneous representation of Fidelity Bank;

10. The acquiescence by Dechert in Carpenter's pledge of stock in violation of restrictions in the shareholders' agreements;

11. The fraudulent bills submitted by Dechert to DirectSat.

Comparison of this listing of alleged "acts of malpractice" by Dechert to those alleged in the cases cited *supra,* as follows, places these claims in perspective. *Compare Gans v. Mundy* (failure to join potentially liable party as a co-defendant); *Zimmer* (failure of counsel for plaintiffs in class action to dispatch notice to class member); *Lentino* (failure to properly advise administrators of pension plan or to amend the plan as the administrators had voted to do); *Gans v. Gray* (failure to follow proper procedures in moving for a new trial, resulting in dismissal of motion); *Storm* (failure to properly retain proceeds of real estate purchase transaction for seller); *Curran* (failure to properly structure a real estate purchase transaction); *Trice*

---

**2.** No other "acts of malpractice" are suggested elsewhere, and therefore we shall confine our

discussion to these allegations.

(failure to attempt to suppress certain evidence); *Mariscotti* (failure to properly evaluate stock holdings of spouse of wife-client in property division); *Pashak* (failure to advise that plaintiff's pursuit of claim would eliminate her future rights to other benefits); *Duke & Co.* (failure to file a malpractice action); and *Schenkel* (failure to join employer of tortfeasor as party).

Except for perhaps the first and the eleventh of the recited alleged "acts of malpractice," each of the claims asserted here is infinitely more complex than *any* of the claims in the foregoing cases. Furthermore, the damages proximately caused to the Debtor, even in the cases of the first and eleventh items, are not obvious, other than the potential liability of Dechert to, respectively, repay Marks' extra curricular benefits (which was mostly done) and deduct any excessive billings. Taken together, assessment of the cumulative effect of these alleged "acts of malpractice" is, in our view, a much more complicated undertaking than the proofs required in any of the foregoing cases. Therefore, clearly, under the principles established in, *e.g.*, *Lentino* and *Storm*, expert testimony on the part of the Debtor was required to sustain a cause of action as to all three requisite elements as to each of the Debtor's eleven claims of malpractice.

    d.   The Only Expert Testimony Presented by the Debtor Pertained to Ethical Violations By Dechert, Which Failed to Establish the Applicable Duty of Care and Breach of that Duty as to Most of the Enumerated Acts of Malpractice by Dechert, Eliminating any Successful Cause of Action as to These Acts.

■ Professor Freedman was the only expert witness called by the Debtor on the issue of liability. While his testimony was both enlightening and persuasive, it was incapable of providing the requisite opinion by an expert in *corporate law* which would have been necessary to sustain a cause of action as to many of the eleven "acts of malpractice" alleged to have been committed by Dechert enumerated *supra*. The only corporate law expert called at the trial

was Mr. Carpenter, and he provided rather narrow, although very competent, testimony on behalf of Dechert, not the Debtor.

Of the eleven alleged "acts of malpractice," only three, *i.e.*, items 1, 9, and 11 were, at core, claims of ethical misfeasance. There was some effort to utilize Professor Freedman's testimony as a means of attacking the alleged deficiencies in communication by Dechert to the Debtor-client in items 4, 6 and 7. However, it is our belief that items 4, 6, and 7 presented, at best, mixed issues of ethical violations and contentions that Dechert failed to properly analyze the applicable corporate law problems raised and/or advise the Debtor accordingly. The merit of the claim that Dechert failed to advise the Debtor's board of directors to cancel Carpenter's stock when it learned of his non-payment is definitely a function of whether, as an issue of corporate law, such advice would have been, given the informational stance of Dechert at the time, not only proper, but so apparently proper that the failure to give such advice was a breach of Dechert's duty of care as ordinary competent counsel. Whether the refusal of Dechert to advise the Board at the June 11, 1985, meeting that the shares issued to Carpenter were wrongly issued constituted malpractice is, in large part, dependent upon whether, as a matter of corporate law, failure to give this advice reflected a breach of any duties. The ethical problems raised by Dechert's conduct challenged by the Debtor in items 4, 6, 7 is, therefore, we believe, a secondary component. Hence, Professor Freedman's testimony is, on these points, insufficient to establish the requisite duties of care and breaches of those duties, as to these items, by Dechert.

The other items raised are clearly claims of corporate law malpractice. The issuance of the stock certificates to Carpenter may or may not have been negligent. The failure of Dechert to heed the recurrent, but sporadic, claims of Zubrow that Carpenter had not made all of this payments may have been negligent corporate practice—or it may have been unrealistic to have cast the disfavored Zubrow in the role of soothsayer. Thus, we are not prepared to say

that Dechert was negligent, as a matter of law, in failing to suspect Carpenter's abject perfidy as to his stock payments. As a witness, Carpenter presented himself as a studious and sincere individual, no more a likely candidate for perpetuation of gross fraud upon his corporate colleagues than a likely candidate for being a mass murderer.

Thus, we are not convinced that the Debtor has shown a breach of a duty of care as to items 2 and 3. With respect to item 5, we find Dechert's participation in Carpenter's efforts to weave and bob when his frauds had been uncovered to be passive efforts to resolve a difficult presenting problem. Whether its attorneys should have been active detractors of Carpenter's efforts is again an issue which we could rule upon only if we were presented with persuasive expert testimony so stating.

The alleged frauds of Carpenter secondary to his centerpiece fraud of failing to pay $750,000.00 frauds set forth in items 8 and 10 were certainly less clear. Therefore, we believe that expert testimony was definitely necessary to establish that Dechert should have uncovered the dealings of Carpenter with the funds from the English investors and his violations of the Shareholders Agreement in his pledge of his stock, as are set forth in items 8 and 10. In the absence of such evidence, we are compelled to conclude that the necessary elements of establishing Dechert's duty and a breach of that duty were not met as to those items.

Therefore, the absence of necessary expert testimony is, in our view, fatal to all but items 1, 9, and 11 among the eleven "acts of malpractice" of Dechert enumerated in its Brief by the Debtor.

e. The Debtor Has Failed to Establish That any or all of the Alleged "Acts of Malpractice" by Dechert Proximately Caused the Loss of Marquee, or That Any of the Acts Concerning Which Evidence of a Breach of Duty was Provided were the Proximate Cause of the Debtor's Deprivation of Funds Which Carpenter was Supposed to Pay to It.

The Debtor identifies, in its Brief, five components of damages (1) Forfeiture of Dechert's counsel fees; (2) Three different measures of compensatory damages, i.e., (a) loss of the $750,000.00 which Carpenter failed to pay; (b) loss of $300,000.00 from the sum invested by the Purchasers Group in January, 1985, which allegedly should have been, but was not, paid into a share premium account; (c) $5.3 million for the loss to the Debtor of Marquee; and (3) Punitive damages.

From this recitation, it can readily be seen that the largest component of damages sought by the Debtor is its claim for compensation for its loss of Marquee. This element of damage, although the Debtor expended a generous portion of the trial simply evaluating its measure, is plainly the most tenuous of its claims. As our previous discussion of proximate cause contained herein at page 515 *supra* emphasized, it is necessary that a particular act be a *substantial* factor in creating a particular adverse result before the actor can be deemed legally liable for damages which arise therefrom. Clearly, there is no expert testimony on this record establishing the link that Dechert's malpractice was the proximate cause of the Debtor's loss of Marquee. Even were we to overlook the absence of expert testimony, we would readily conclude that to attribute the Debtor's loss of Marquee to Dechert would be difficult, if not impossible.

The Debtor's loss of Marquee was, in our view, attributable to a myriad of factors. As McNeil himself apparently believed at the time of the acquisition, the management of the Debtor, which had manifested difficulty in handling its own affairs, without the added burden of running Marquee, may simply not have been equal to the task of running it under any circumstances. Money was, of course, always a problem for the Debtor, and having in fact had the $1 million siphoned off by Carpenter's fraudulent acts certainly would have helped. However, putting aside whether Dechert can be held responsible for Carpenter's defalcations, it is certainly not clear that an extra $1 million would have

been sufficient to have save the Debtor from the financial throes that led to its bankruptcy and the loss of Marquee.

One of the principle contentions of the Debtor regarding the loss of Marquee seems to be that it could have been saved if, at the June 11, 1985, board meeting, Dechert had opined that Carpenter had no right to vote his shares because of his failure to fully pay for them. Had Dechert given such an opinion, the Debtor contends that the ultimate deadlock of the board between the Carpenter–Schiff interests and the McNeil–Trask interests could have been broken, and the Debtor may well have been able to obtain funding at the crucial pre-bankruptcy juncture.

We perceive several difficulties with this line of reasoning. First, the conclusion that Dechert breached a duty in failing to give the opinion, which the Debtor, with the benefit of hindsight, contends would have saved it, is not supported by any expert testimony.[3] Moreover, there was no expert testimony supporting the notion that Dechert's actions on June 11, 1985, were in fact a proximate cause of the Debtor's failure to obtain capital through the end of 1985. Evidence that an opinion from Dechert would in fact have been a substantial factor in breaking the deadlock would have been necessary to sustain this contention.

We also believe that the deadlock could have been broken by other means. There is no expert testimony to support the bare statements of a layman, *i.e.*, McNeil, that it was futile to attempt to get an opinion from Wolf, Dechert's successor-counsel, or resort to the courts to resolve this question. That the issue was resolved so painlessly just a few months later, in the summer of 1986, suggests that, had the McNeil–Trask faction pressed the issue at some level in late 1985, it may have been

resolved. There is nothing in our minds, other than speculation, supporting the notion that Dechert's failure to give an opinion on June 11, 1985, was an irreversible turning-point in the entrenchment of the Carpenter–Schiff faction in its view that it had majority ownership of the Debtor.

In sum, as we previously indicated at pages 518–19 *supra*, we do not believe that it has been proven that the conduct of Dechert which led to the loss of Marquee constituted breaches of duties on its part. However, assuming *arguendo* that certain breaches relevant to this issue were found to have occurred, the Debtor has failed to prove that those breaches were the proximate cause of the Debtor's loss of Marquee. This conclusion causes us to decline to address the further doubtful issue of whether the Debtor has proven that the damages to it from the loss of Marquee may be measured by a sum in excess of $5 million.

The second element of damages is the loss of $1,050,000.00 to the Debtor as a result of Carpenter's failure to pay for his stock ($750,000.00) and as a result of Carpenter's siphoning off the funds from the English investors which allegedly should have been placed in a share premium account ($300,000.00). Here, the element of proximate cause is less problematical than the claim that Dechert was responsible for the loss of Marquee. The Debtor argues that Dechert is simply liable for loss of those funds which it failed to receive because Carpenter failed to remit them. This claim would appear to state the absolute minimum amount to which Carpenter is liable to the Debtor. However, the crucial issues in attributing these losses to Dechert, as opposed to Carpenter, are determining whether Dechert breached any duties in failing to discover Carpenter's actions and whether it acted with appropriate promptness once they were discovered.

---

**3.** Professor Freedman testified that, in his opinion, Dechert committed a breach of ethics in failing to explain the reasons why its attorneys could not give an opinion regarding the legitimacy of Carpenter's ownership of stock at the June 11, 1985, meeting. Assuming *arguendo* that such a breach of ethics occurred, there is no basis for inferring that, had Dechert fully

explained any reasons it had for failing to give such an opinion, if any it had, that explanation would have cured the consequences flowing from its failure to give an opinion. Moreover, Professor Freedman did not express the opinion, nor was he qualified to so do, that Dechert breached a duty to the Debtor by not opining that Carpenter had no right to vote his stock.

Finally, assuming *arguendo* that breaches of duties can be found, Dechert's breaches must be found to have proximately caused the Debtor to lose the funds which Carpenter failed to remit to it.

As we indicated at pages 518–19 *supra,* the failure of the Debtor to present any expert testimony to support its allegations that Dechert's failure to ferret out Carpenter's rather unlikely defalcations dooms the Debtor's attempts to pin liability of these losses on Dechert. We specifically decline to hold that Dechert's conduct in failing to discover Carpenter's failure to make payment and the issuance of stock certificates to him was negligent *per se.* Carpenter's behavior appears to us to have been completely unexpected.

As Dechert points out, and with some force on this particular point, they were not the only ones sucked in by Carpenter's actions. No corporate employees or directors, including Zubrow, consistently contended that Carpenter had not made the requisite payments. It was not established that anyone, including Zubrow, ever called the issue of Carpenter's non-payments to Arthur Andersen's specific attention. Also, it should be noted that it took Andersen itself several months to uncover Carpenter's actions. Andersen, not Dechert, was the Debtor's auditor, and hence the more likely party between the two to successfully investigate and come upon the payment problem. Given the proximity of these other actors to access to information concerning Carpenter's payments relative to Dechert, and their failure to uncover his non-payments, we are reluctant to conclude intuitively that Dechert's actions were the proximate cause of the loss of Carpenter's payments to the Debtor. The absence of expert testimony supporting the causation link is, in our view, fatal to this claim.

In our previous discussion, we concluded that only items 1, 9, an 11 of the alleged "acts of malpractice" were breaches of ethical duties which were sufficiently supported by Professor Freedman's expert testimony. However, that testimony did not in any sense support the conclusion that these actions caused the loss of Marquee or the failure of Carpenter to remit the missing $1,050,000 to the Debtor. Item 1, the Marks consulting scheme, does not appear closely related to Carpenter's actions, it related to it at all. The testimony of both Carpenter and Marks failed to support the notion that there was any symbiosis between the two. Marks' victim in his scheme was the Debtor. Carpenter was a secondary *victim* of the scheme, not a participant gaining by it. In fact, it appears to us that, if anything, concealment of his "consulting" scheme would have created an incentive to Marks to be especially careful that no other problems arose in the course of his representation of the Debtor, so that he could secretly perpetuate the scheme. As it developed and as might have been anticipated, the discovery of Carpenter's payment delinquencies apparently was a factor in blowing the cover from Marks' acts. There was absolutely no evidence supporting the theory—and we expressly decline to find—that Marks looked sideways at Carpenter's actions because he was being paid pursuant to his consulting scheme. Therefore, it is very difficult for us to conclude that Marks' scheme gave rise to any damages other than those normally deemed appropriate in the event of a gross breach of ethical standards in themselves. We shall deal with this issue at pages 522–25 *infra.*

Item 9, the alleged conflict with Fidelity, is, in our view, a substantively weak claim, and we reject its viability. Both the Debtor and Fidelity knew that Dechert was simultaneously representing them both. It seems apparent that the Debtor properly considered this dual representation an asset to it. Due to this relationship, the Debtor, though in dubious financial condition, was twice able to obtain needed financing through Fidelity.

Furthermore, there is no evidence of any instance where Dechert served Fidelity's interests at the Debtor's expense. Fidelity and the Debtor were both big losers as a consequence of the Debtor's financial collapse. Discovery of Carpenter's failure to make payments at an earlier time could have only helped Fidelity. Prompt resolution of the stock ownership issue could only

have helped Fidelity. None of the "acts of malpractice" were directed at benefiting Fidelity at a cost to the Debtor.

The final item 11, relating to Dechert's bills, would appear to have had no causative impact on any losses to the Debtor other than increasing Dechert's bill.

Therefore, we find that items 1, 9, and 11 of the alleged "acts of malpractice" did not cause or contribute in any way to the Debtor's loss of Marquee or its failure to receive Carpenter's payments.

The absence of proof of that any of these "acts of malpractice" caused any of the harms for which damages are claimed is fatal to all of them. Given the additional failure of the Debtor to prove the applicable corporate law duties of care and breaches thereof by Dechert through expert testimony, we are compelled to conclude that all of the Debtor's claims for damages based upon allegations of malpractice must fail.

3. *The debtor has established the validity of its claims that Marks engaged in gross ethical violations, thereby creating an intolerable conflict of interest and entitling the debtor to recover a forfeiture of Dechert's entire fee of $368,087.05 in this engagement*

a. Marks' Attempt to Receive Additional Compensation for His "Personal Consulting Services" to the Debtor Created Intolerable Conflicts of Interests Between the Debtor and Himself

■ The attempt of Louis Marks to collect additional compensation from the Debtor was totally improper. However, Professor Freedman, in expert testimony that was directly to the point, explained how, in several less than obvious senses, this action placed Marks himself personally directly in conflict with his role as lead counsel in its representation of the Debtor. One area of conflict, perhaps too obvious to be recited by Professor Freedman, was readily apparent to us. Marks was, like a wolf in sheep's clothing, pillaging his own client. He was taking from the Debtor, for what he knew or should have known was no legitimate purpose, exactly what it needed the most, *i.e.*, cash. The less obvious senses in which Professor Freedman testified that conflicts existed as a result of this arrangement were as follows: (1) Since Marks had placed himself into a non-legal business relationship with the Debtor, he had jeopardized its attorney-client privilege with him; (2) The stock option granted to Marks, if exercised, would render him an interested party; and (3) It presented the appearance of his allegiance with Carpenter in his fraudulent course of conduct. This latter point, in our view, cannot be overlooked as an ethical issue despite our finding that no allegiance of Marks with Carpenter's frauds in fact existed. It was this appearance of impropriety which was a spearhead to this entire very costly and painful extended piece of litigation.

There was no real disagreement between Professor Freedman and Professor Reitz as to any of these conclusions. Marks' scheme could not be defended. Marks' only feeble attempt at justifying his actions was an assertion that his actions in obtaining financing for the Debtor really were above and beyond the scope of his employment as lead counsel. This "explanation" was considerably less impressive than Marks' admission, when he was called for the second time in Dechert's case, that this was something he now deeply regretted, as properly he should.[4]

■ We feel quite differently about the claim that Marks or Dechert had an "intolerable" conflict of interests in light of its simultaneous representation of the Debtor and Fidelity. This potential conflict was totally disclosed and totally consented to by the Debtor. We shall therefore discount it. We also shall not address the allegedly fraudulent fee bill claim any further except to recite it among the contributing factors

---

**4.** We are compelled to report Marks' course of conduct to the local Disciplinary Board pursuant to Canon 3(B)(3) of the Code of Judicial Conduct. We are somewhat surprised that no attorney aware of Marks' conduct has contemplated the duty to report this conduct to the Disciplinary Board. *See* Rule of Professional Conduct 8.3(a).

to our refusal to mitigate the consequences to Dechert to complete forfeiture of all of the fees which it collected from the Debtor in this engagement.

b. Forfeiture of all Fees Earned Throughout the Engagement is the Appropriate Penalty for Such a Flagrant, Aggravated Actual Conflict of Interest

■ The controlling principle in determining what consequences flow from such a gross conflict of interests is articulated by the Supreme Court in a bankruptcy case, *Woods v. City Nat'l Bank & Trust Co. of Chicago,* 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941), where it is simply stated: "Where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation." In that case, moreover, although no "fraud or unfairness" resulted, *id.,* complete denial of compensation, except reimbursement for certain expenditures, resulted. *Id.* at 269–70, 61 S.Ct. at 497–98. *See also Mosser v. Darrow,* 341 U.S. 267, 271, 71 S.Ct. 680, 682, 95 L.Ed. 927 (1951) (personal dealings in stock of debtor by employees of trustee required surcharge of all of employees' profits, despite lack of evidence of wrongdoing). Here, Marks took no action to disclose or undo the actual conflict of interests which we believe *had* obvious manifestations of fraud and unfairness until his covert scheme was uncovered, apparently by actions of third parties.

The principle that "an attorney must not represent opposed interests" is not novel, but "had become common-place" as early as "the beginning of the Seventeenth Century." *Silbiger v. Prudence Bonds Corp.,* 180 F.2d 917, 910 (2d Cir.) (per LEARNED HAND, J.), *cert. denied,* 340 U.S. 831, 71 S.Ct. 37, 95 L.Ed. 610 (1950). *See In re Greater Pottstown Community Church of the Evangelical Congregational Church,* 80 B.R. 706, 712 (Bankr.E.D.Pa.1987) (conflicts of interest have been disfavored "at least since biblical times"). As we ourselves recently held, this principle has persisted: "the traditional remedy for any act in conflict of the debtor's interest is total denial of *all* compensation." *In re New York City Shoes, Inc.,* 89 B.R. 479, 484 (Bankr.E.D.Pa.1988), *appeal dismissed,* C.A. No. 88–7174 (E.D.Pa. Jan. 17, 1989). This conclusion followed our earlier decisions in *In re Tigue,* 82 B.R. 724, 731–32, 737–38 n. 3 (Bankr.E.D.Pa.1988); and *Greater Pottstown, supra,* 80 B.R. at 710–12. *Accord, e.g., In re Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1256 (5th Cir.1986); *In re Georgetown of Kettering, Ltd.,* 750 F.2d 536, 540 (6th Cir.1984); and *In re Chou–Chen Chemicals, Inc.,* 31 B.R. 842, 851 (Bankr.W.D.Ky.1983).

The parties stipulated that the total fee paid to Dechert by the Debtor was $368,087.05. This sum, though considerable, is the amount which we believe, under the "traditional remedy" for an actual conflict of interest, the Debtor must be recompensed by Dechert. No proof of any element of causation by the Debtor other than the breach of ethical duties and the payment of fees is necessary to prove this element of damages.[5]

c. Dechert Should be Liable for the Entire Forfeiture of Fees; The Egregiousness of Marks' Conduct and Dechert's Own Insufficient Responses and Lack of Remorse Allow For No Mitigation

Other than its persistent bleats that *it* has done nothing wrong, the only real defense presented by Dechert to the Debtor's claim that its entire fee should be forfeited is its citation to *In re Eastern Sugar Antitrust Litigation,* 697 F.2d 524, 533 (3d Cir.1982). In that case, while agreeing

---

**5.** There is also no need to explore the debate as to whether violations of ethical rules can constitute substantive legal violations. *Compare In re Estate of Pedrick,* 505 Pa. 530, 535, 482 A.2d 215, 217 (1984) with *Tigue, supra,* 82 B.R. at 734; and *In re Mushroom Transportation Co.,* 70 B.R. 416, 418 n. 4 (Bankr.E.D.Pa.1987). The only

cause alleged by the Debtor here which is sustained is the claim of an ethical violation. The only relief granted is in the nature of a traditional penalty for the ethical violation of representing conflicting interests. Whether such a violation could create a cause of action for other damages is not before us.

"that return of fees paid for services rendered before the date of the impropriety may be an appropriate remedy for some ethical violations," the Court of Appeals held that "such a sanction should be reserved for cases in which the breach of professional ethics is so egregious that the need for attorney discipline and deterrence of future improprieties of that type outweighs" the windfall that results to the client therefrom. *Id.* *Compare New York City Shoes, supra,* 89 B.R. at 483–84 (compensation of non-attorney professional who committed a relatively brief lapse of judgment and concerning whom no party persisted in requesting a reduction of compensation was required to forfeit only compensation earned after the breach).

We believe that the conduct of Marks here *was,* by any standard, an *egregious* breach of ethics which must be deterred. The very conduct itself, which brings discredit to the entire profession, could scarcely have been more odious. Further, we note the secrecy of this arrangement and the failure of Marks to disclose it until confronted by others with the discovery of his wrongdoing. Plainly, Marks did everything he could to conceal this arrangement as long as possible. His contemporary "regret" is, we suspect, largely created by the fact that he was caught.

We have no hesitancy in finding Dechert totally liable for Marks' actions. He was a partner, and was clearly acting in the scope of his firm's ordinary course of business when he committed the acts in issue. *Cf. Bingham v. Zolt,* 683 F.Supp. 965, 975 (S.D.N.Y.1988) (applying New York law).

Two other factors countermand whatever feeling of sympathy we may have had for Dechert as, arguably, another of the victims of Marks' actions. First, the response of Dechert to Marks' divulgence of his gross improprieties was shockingly mild. While it made him return the money collected, it did nothing to make him disgorge the value of the free use of an automobile and the trip to Disney World which he and his family had enjoyed at the Debtor's expense. It expressed neither public nor private remorse, apologies, or recognition of the conflicts of interest created by Marks' conduct to the Debtor in any way. It did not even take the obviously necessary action of removing Marks from his role as lead counsel (or counsel at all) in its representation of the Debtor after discovery of his actions. Rather, it returned him to his prior role with a figurative slap on the wrist and proceeded with "business as usual," at least for the next several days until it was, with justification, replaced as the Debtor's counsel.

Dechert attempted, at oral argument, to rationalize its failure to remove Marks for his position as lead counsel in this engagement by pointing to its reluctance to squander the value of Marks' long experience in representing the Debtor. However, as we pointed out in *New York City Shoes, supra,* 89 B.R. at 485, "a conflict is like a disability that we cannot ignore." Severely disabled, as it were, by his past egregious conflicts, Marks simply could not be allowed to resume his past representation of the Debtor. It was apparently only due to Dechert's dismissal as counsel that his involvement did not continue indefinitely.

Secondly, the posture of Dechert in this trial, most explicitly in the testimony of Seltzer, but implicitly in all of its witnesses and even its counsel's oral argument, reflects a disturbing lack of awareness of the magnitude of the wrongs manifested in the behavior of Marks. Seltzer, far from being apologetic, was quick to find fault in all others except his firm and himself. His demeanor throughout his entire testimony, as characterized by his "bag of sleaze" quotation, *see* page 514 *supra,* was one of barely-contained hostility, despite Ervin's typically reserved decorum during his examination. Furthermore, Seltzer's own lack of decorum appears to be just the most obvious manifestation of Dechert's lack of any sense that the Debtor was wronged by its conduct. The main concern of Dechert appeared to be proclaiming its own self-righteousness because it deemed Marks' profiteering contrary to the "culture" of its firm and made him disgorge some of his profits. The adverse ethical ramifications of Marks' conduct, as enu-

merated at page 522 *supra,* seemed to be beyond its comprehension.

The more obvious manifestations of Dechert's apparently still-warped perspective of this matter are exemplified by two actions: (1) Its submitting a padded bill to the Debtor and its making a Proof of Claim in this case; and (2) Its joinder of Illick, McNeil, and O'Brien as third-party defendants in this case and its persistence in pursuing its groundless claims against them.

We totally reject that notion that human relationships outside of the (hopefully) recognized fantasy of sports can be characterized by the maxim that "the best defense is a good (counter)-offense." The courts are too busy to tolerate frivolous claims made mostly for the sake of attempting to draw attention away from legitimate claims against a counter-attacker. The proper response to a justified attack is never to blame (and therefore counter-attack) the victim.

Dechert must, therefore, suffer complete forfeiture of its fees. Given this disposition, the "fraudulent bill" claim is moot, as all fees, including those billed fraudulently, will be either commuted or, if already paid, remitted to the Debtor. Needless to say, Dechert's original proof of claim for compensation and reimbursement of fees is wiped out by this result.

4. *Dechert's claims against the third-party defendants are moot, due to the failure of the debtor to prevail on its malpractice claims*

The Debtor herein prevails on only its claims that Dechert's fees must be forfeited due to its unethical conduct. It does not prevail on its malpractice claims.

The unethical conduct of Marks which gave rise to the claims of breach of ethics does not implicate any of the third-party defendants. Even Carpenter was among the victims of Marks' scheme.

In any event, there is absolutely no evidence supporting liability of Illick, McNeil, or O'Brien on any basis, including the "breach of corporate duty" theory which Dechert alludes to briefly in its Brief. *See*

*In re New York City Shoes,* 84 B.R. 947, 958–59 (Bankr.E.D.Pa.1988); and *In re Athos Steel & Aluminum, Inc.,* 71 B.R. 525, 540–43 (Bankr.E.D.Pa.1987).

## D. CONCLUSION

Judgment will be entered in favor of the Debtor against Dechert in the amount of $368,087.05, as a forfeiture of Dechert's fees. All other claims by the parties *inter se* are dismissed. Also, the events described herein will be reported to the Disciplinary Board of the Supreme Court to alert that body to the potential for taking appropriate action beyond the relief which we are prepared to award. An appropriate Order will be entered.