In re METRO TRANSPORTATION CO.,
t/a Yellow Cab Co., Debtor.

METRO TRANSPORTATION CO.,
d/b/a Yellow Cab Company,
Plaintiff,

v.

CONTROLLED RISK SERVICES,
INC., Defendant.

Bankruptcy No. 86–03618S.
Adv. No. 89–0068S.

United States Bankruptcy Court,
E.D. Pennsylvania.

April 23, 1990.

Kevin W. Walsh, M. Kelly Tillery, Keith N. Leonard, Leonard, Tillery & Davison, Philadelphia, Pa., for debtor.

Mary F. Walrath, Clark Ladner Fortenbaugh & Young, Philadelphia, Pa., for Unsecured Creditors' Committee.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa.

Thomas J. Duffy, Jr., Jonathan Dryer, Wilson Elser Moskowitz Edelman & Dicker, Philadelphia, Pa., Arthur Miller, Miller and Litman, New Brunswick, N.J., for defendant.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Once again, this court is asked to resolve a conflict arising from what has developed as the successful Chapter 11 rehabilitation of the principal purveyor of taxicab services in the city of Philadelphia, METRO TRANSPORTATION CO., trading as YELLOW CAB CO. ("the Debtor"). In this proceeding, the Debtor avers that Controlled Risk Services, Inc. ("CRS"), originally appointed as the Debtor's Third Party Administrator ("TPA") under written contract to administer post-petition insurance claims against the Debtor during its reorganization, is liable to the Debtor for damages resulting from negligence or professional malpractice, breach of its contract, and breach of its fiduciary duties to the Debtor as its TPA. These claims were asserted in a complaint filed in the above-captioned adversary proceeding only after CRS filed a "motion" seeking compensation for its services performed as TPA subsequent to April 12, 1988, for which CRS had not been compensated prior to its discharge. In a counterclaim to the complaint, CRS reiterated its claim for compensation and also sought interest, compensation for handling certain subrogation claims, and other damages resulting from its allegedly wrongful termination as TPA.

We conclude, after a tortuous course of pre-trial proceedings, a five-day consolidated trial on the motion for compensation and the complaint and counterclaim in the adversary proceeding, and consideration of voluminous post-trial submissions, that the

Debtor has failed to meet its burden of proving CRS guilty of tortious malpractice. Consequently, we find that the Debtor's other claims, demanding proof of comparable elements, also lack merit.

However, we also conclude that CRS' performance of its services was not exemplary, and that the Debtor was within its rights in terminating the TPA contract on its finding that CRS was not adequately performing its duties. Therefore, we conclude that CRS is entitled to compensation for services performed prior to its termination, but is not entitled to recover on any claims attributable to closing cases which were merely transferred to the new TPA, interest, or any damages for alleged wrongful termination of the parties' contract.

## B. PROCEDURAL HISTORY

The facts surrounding the Debtor's bankruptcy filing and its need for approval of its self-insurance plans to replace its loss of private insurance coverage are set forth in detail in an Opinion filed over 3½ years ago in this case, reported at 64 B.R. 968, 969–71 (Bankr.E.D.Pa.1986) (*"Metro I"*).[1] For the purposes of clarity, we repeat some of these facts at Findings of Fact 1–13, pages 878–80 *infra.* We also add that on October 25, 1989, the Debtor's Plan of Reorganization was confirmed. However, we also note that the effective date of the Plan was to be triggered by the approval of the Pennsylvania Public Utility Commission ("PUC") of certain transfers of Certificates of Public Convenience and the grants of liens on the Certificates to certain secured creditors, which has not yet transpired.

CRS' request for final compensation for its services, which set the instant proceedings into motion, was filed on October 7, 1988. The motion requested that the Debtor deposit $75,000 into a special custodial account to be applied toward compensation of services performed by CRS as described

in 15 invoices dated between April 12, 1988, and July 15, 1988, totalling $69,303.54. Interest of twelve (12%) percent per annum is demanded for any delay over thirty days in payment of each invoice.

When the Debtor and the Official Unsecured Creditors' Committee of the Debtor ("the Committee") objected to the motion for compensation, it was set down for a hearing on November 2, 1988. In a colloquy on that date with interested counsel, the Debtor indicated an intention to file the instant adversary proceeding. Accordingly, we entered an Order of November 3, 1988, requiring the Debtor to file the projected adversary proceeding on or before February 1, 1989, and setting forth the pre-trial schedule for a consolidated trial on CRS' motion and the adversary proceeding on March 15, 1989.

The trial date was continued to April 27, 1989, and then, per an Order of April 6, 1989, to August 1, 1989, in order to permit the parties to respond to certain outstanding discovery under a schedule established by the court. On July 17, 1989, CRS filed a renewed motion for sanctions against the Debtor for its failure to comply with our Order of April 6, 1989, and the Debtor, admitting non-compliance by special counsel initially appointed to try the case, moved, on July 18, 1989, to replace that special counsel with new special counsel and to continue the trial again. By Order of July 28, 1989, we allowed CRS, but not the Debtor, an extension of time to complete discovery due to the Debtor's failure to adhere to the terms of the Order of April 6, 1989, and we established a new pre-trial schedule contemplating the commencement of the consolidated trial on October 24, 1989.

In its pre-trial submissions, CRS requested that we bifurcate the liability and the damage aspects of the Debtor's claims. Weighing the factors of convenience to the

1. Other Opinions arising out of this case are reported at 87 B.R. 338 (Bankr.E.D.Pa.1988) (Debtor permitted to reject executory pre-petition settlement agreement with its owner-drivers); 82 B.R. 351 (Bankr.E.D.Pa.1988) (pre-petition victim of accident with one of the Debtor's cabs denied relief from the automatic stay); and 78 B.R. 416 (Bankr.E.D.Pa.1987), *aff'd in part and remanded in part,* 107 B.R. 50 (E.D.Pa.1989) (interim fee application of counsel for Creditors' Committee reduced).

parties and the court, possible prejudice to the parties, and economy of resources in a matter in which we had skepticism of the merits of the claim, *see, e.g.,* Bankruptcy Rule ("B. Rule") 7042, Federal Rule of Civil Procedure ("F.R.Civ.P.") 42(b); *Emerick v. U.S. Suzuki Motor Corp.,* 750 F.2d 19, 22 (3d Cir.1984); and 5 J. MOORE, ¶ 42.03[1], at 42–36 to 42–41 (2d ed.1989), we granted the motion to bifurcate.

A five-day trial on the issue of liability alone as to the Debtor's claim, as well as the motion for compensation filed by CRS in the Debtor's main case, ensued on October 24, 1989, October 31, 1989, November 2, 1989, November 13, 1989, and November 14, 1989. In the course of the trial, the parties expressly agreed, pursuant to 28 U.S.C. § 157(c)(2), that this court could determine the adversary proceeding, assuming *arguendo* that it was not core. *But see, e.g., In re Ben Cooper, Inc.,* 896 F.2d 1394, 1397–1400 (2d Cir.1990); and *In re Jackson,* 90 B.R. 126, 128–31 (Bankr.E.D. Pa.1988) (post-petition events relating to insurance coverage and alleging malpractice, respectively, are core proceedings, pursuant to 28 U.S.C. § 157(b)(2)(A)). Throughout this Opinion, we will refer to the transcripts of each of those respective days of trial as "Transcripts I, II, III, IV, and V," respectively.

Delays in ordering the transcripts resulted in extension of the post-trial briefing through March 13, 1990. Settlement conferences of November 17, 1989, and January 12, 1990, before the Honorable William H. Gindin, Chief Judge of the District of New Jersey, who appeared to assist this court with its overwhelming caseload, were unsuccessful.

The post-trial submissions were copious, but addressed almost exclusively the Debtor's claims against CRS in the adversary proceeding, neglecting almost entirely CRS' motion for compensation and counterclaims. Given the lack of prominence which even CRS has given these aspects of the matters before us, we consider and dispose of them summarily.

Pursuant to the dictates of B.Rule 7052 and F.R.Civ.P. 52(a), our decision is rendered in the format of Findings of Fact, Conclusions of Law, and a Discussion relating to the claims in the adversary complaint, followed by our summary disposition of the other aspects of the matters before us.

## C. FINDINGS OF FACT

1. On January 26, 1982, the PUC authorized the Debtor to operate eight hundred (800) taxicabs in the City of Philadelphia.

2. The Debtor's liability insurer, Balboa Insurance (hereinafter "Balboa"), announced that it intended to cancel its coverage of the Debtor as of August 1, 1986.

3. The Debtor filed its Chapter 11 bankruptcy petition on July 29, 1986, seeking, principally, to address the crisis in its operations created by the threat that its insurance with Balboa would be cancelled and not replaced.

4. On July 29, 1986, and August 6, 1986, this court, per Chief Judge Emil F. Goldhaber, issued, respectively, a Temporary Restraining Order requiring Balboa to continue its insurance coverage to the Debtor through August 6, 1986; and an Order approving a Stipulation between the Debtor and Balboa pursuant to which Balboa would continue coverage of the Debtor until October 1, 1986, and the Debtor would be prohibited from requesting this court to continue Balboa's coverage after October 1, 1986.

5. About a year prior to the cancellation of Balboa's insurance coverage, on October 12, 1985, the Debtor filed an application with the PUC requesting that it approve certain self-insurance components of the Debtor's coverage under the Balboa policy. On August 4, 1986, the Debtor amended its self-insurance application to request the PUC to approve a revised self-insurance plan contemplating no participation by an independent insurance company.

6. On August 12, 1986, the PUC filed an adversary proceeding in this court seeking declaratory and injunctive relief with regard to its denial of the Debtor's application for self-insurance. In an Answer and

Counterclaim, the Debtor sought to stay the enforcement of PUC's decision.

7. A hearing on the Debtor's revised self-insurance application was held by PUC Administrative Law Judge Herbert Smolen ("ALJ Smolen") on August 25, 1986. At the hearing, the Debtor and the PUC submitted a Settlement Agreement dated August 25, 1986, which left open, as the only issue to be decided, the question of whether the Debtor could fund the plan. However, ALJ Smolen eschewed the Settlement Agreement and recommended, in an Initial Decision dated September 12, 1986, that the PUC deny the Debtor's revised application because "[t]he proposed self-insurance program, as submitted, does not adequately protect the interests of Metro's patrons and/or the general public." On September 25, 1986, adopting ALJ Smolen's recommendations, the PUC denied the Debtor's self-insurance application.

8. A hearing on PUC's Complaint and the Debtor's action was held on September 24, 1986. In our Opinion of September 29, 1986 (*Metro I*), we concluded that, given the protections to the public included in the Settlement Agreement, and the devastating impact that denying relief would have upon the Debtor's estate, *Metro I*, 64 B.R. at 973–75, granting the extraordinary relief of allowing the Debtor to self-insure and operate under the terms of the August 25, 1986, Settlement Agreement was appropriate.

9. We also required, in an unpublished portion of the Order accompanying *Metro I*, that the Debtor continue to search for available conventional insurance and periodically report to the court on its progress in that regard.

10. The Settlement Agreement required the Debtor to retain a TPA to "investigate, adjust, litigate and, when appropriate in the judgment of the TPA, settle claims ... upon such terms and conditions as established by this order and the contract." Further, the Settlement Agreement required the Debtor to "enter into a contract with the TPA which shall incorporate the Fair Claims Practices Act which, together with otherwise applicable investigative and settlement standards of care, fairness and thoroughness, shall constitute the procedures to be followed by the TPA."

11. The Debtor retained CRS as its TPA and, on December 3, 1986, entered into a final Claims Administration Agreement ("the CAA"), pursuant to which CRS would serve as the TPA for all "incidents and events occurring after 12:01 A.M., October 1, 1986 ..." The CAA was preceded by a letter agreement of October 27, 1986. However, we conclude that the CAA was intended to be the formal consummation of the parties' negotiations, and therefore all terms of the parties' contractual relationship merged into the CAA. *See, e.g., In re Kellett Aircraft Corp.*, 173 F.2d 689, 691–93 (3d Cir.1949).

12. The following provisions of the CAA are pertinent to the instant ·matter:

3. *EMPLOYMENT OF COUNSEL.* TPA will have sole authority and discretion to appoint, dismiss or substitute independent counsel to defend all claims against METRO, provided, however, that such employment shall be subject to approval of the Bankruptcy Court.... When it appears, in the judgment of either TPA or METRO that a claim may exceed $500,000.00, ..., TPA shall permit METRO, at METRO's éxpense, to be associated with TPA in the defense or control of any claim or legal proceeding.

. . . . .

6. *REPORTS.* TPA will furnish METRO with the following reports:

(a) Subject to the receipt of data from the bank administering the funds, a weekly report on the status of the funds in the Claims Fund and the Expense Fund established pursuant to the self-insurance program, including total sums received, amounts paid, and balance remaining in said fund at the close of each business week;

(b) A monthly financial report of all claims losses paid and reserved, and allocated expenses paid during the period.

(c) Management data base reports, as agreed.

7. *SETTLEMENT OF CLAIMS.* TPA shall have sole authority and discretion to settle all claims or losses arising out of any single occurrence where the total aggregate of claims does not exceed $500,000.00, and such settlements by TPA shall be binding on METRO....

8. *FEES AND EXPENSES.* TPA shall be entitled to a fee out of the Expense Fund of $175.00 per claim....

In addition, TPA shall be entitled to reimbursement of all expenses ... required to comply with the terms of this Agreement and other out-of-pocket expenses relating to the administration of claim [sic].

. . . . .

10. *REPORT AND INVESTIGATION OF CLAIMS BY METRO.* METRO shall within twenty-four hours of receipt of notice of any claim, inform TPA thereof. METRO shall, within two business days of receipt of all accident reports, deliver copies thereof, together with all items of evidence received by METRO to TPA. METRO shall be permitted but is not required to perform, at its own expense, an initial investigation of any accident.

11. *CLAIMS RESOLUTION.* TPA shall perform the investigation, adjustment, litigation, and when appropriate in the judgment of TPA, the settlement of all claims.

. . . . .

13. *FAIR CLAIMS.* Both TPA and METRO are aware of the Unfair Claims Settlement Practices Regulations established pursuant to the Pennsylvania Unfair Insurance Practices Act ... [B]oth TPA and METRO shall voluntarily comply with the requirements of said Act and said Regulations, except to the extent that said Act and Regulations may be inconsistent with any provisions of the Bankruptcy Code, Bankruptcy Rules or any orders of the Bankruptcy Court.

14. *AUDITS.* TPA shall make its files and records available to METRO and the PUC upon request by either for inspection thereof during regular business hours upon two business days notice....

. . . . .

16. *TERMINATION.* This agreement may be terminated by TPA, METRO, and or any Trustee appointed by METRO on 20 days written notice in any of the following events:

. . . . .

(e.) A finding by METRO that the TPA is not adequately performing his duties under the terms and conditions of this Agreement, including but not limited to failure to properly settle claims in a timely fashion under the terms hereof.

(f.) TPA's willful misconduct, gross negligence or fraud.

13. This court, by Order dated December 4, 1986, approved the CAA and the retention of CRS as the Debtor's TPA pursuant to it.

14. Marshall Sherman, the Vice–President of CRS ("Sherman"), was employed by the Debtor from approximately April, 1983, through June, 1985, as the Director of the Debtor's insurance operations in its in-house claims department. Sherman was a well-respected and valued employee of the Debtor and resigned under amicable circumstances. While in the Debtor's employ, Brian Somerman, President and Chief Executive Officer of the Debtor ("Somerman"), testified that "[Sherman] did an excellent job." Transcript I, at 12–13.

15. The Debtor retained Sherman and CRS as its TPA based upon Sherman's "expertise and the trust of [the Debtor]." *Id.* at 20.

16. The relationship between the Debtor and CRS remained on good terms throughout the first year of the CAA, but began to deteriorate during the second year. According to Somerman, problems arose because the Debtor was not receiving monthly loss-runs as required under the CAA and was concerned about what it considered the high level of reserves set by CRS.

17. In April or May of 1988, Somerman first suggested a peer review of CRS'

claims-handling practices. Sherman agreed to the peer review.

18. K. MacDonald and Associates, Inc. ("KMA") was retained by the Debtor, without court approval, to conduct the peer review of CRS. KMA is a corporation which has been in existence since 1984 which has six (6) offices and approximately fifty (50) employees and is engaged in the business of claims adjustment and administration. KMA is owned by Kevin MacDonald ("MacDonald"), who is also KMA's President.

19. KMA was retained, by letter dated April 11, 1988, from Debtor's counsel, to perform a "review and evaluation of randomly selected reserves established by [CRS] and claims payments made in connection therewith." See Plaintiff's Exhibit 13.

20. KMA is a competitor of CRS. Sherman testified that he was displeased at the selection of KMA to perform the peer review, but admitted that he did not articulate those concerns to the Debtor prior to the performance of the peer review by KMA.

21. While, at the time of the peer review, the Debtor and KMA testified that they had no direct discussions about KMA's replacing CRS as TPA under its self-insurance plan, based upon all of the testimony and evidence, we find that, before KMA's engagement began, the Debtor contemplated replacing CRS with KMA and that KMA desired to replace CRS.

22. KMA conducted two audits of CRS. The first audit was conducted shortly before May 18, 1988 (hereinafter "the First Audit"). In doing this audit, KMA inspected approximately ten (10%) percent of CRS' files, which represented forty-five (45%) percent of the total amounts paid by the Debtor on the claims handled by CRS.

23. KMA issued an audit report dated May 18, 1988, detailing its findings from the First Audit ("the First Report"). In a cover letter dated as of even date therewith, KMA summarized the findings in the First Report as follows:

> It is this company's opinion that the files reviewed reflected inconsistency in reserving practices, a lack of recognition of proper coverages and potentially inappropriate payment of claims. The files also lacked adequate record keeping regarding file contents and payments. Moreover, file contents were not well organized. We also recommend more adequate computer hardware and statistical data record keeping in order to sufficiently administer the program.

See Plaintiff's Exhibit 16.

24. KMA also recommended that a more extensive audit of CRS' practices be conducted by it. The Debtor requested KMA to immediately conduct such a more extensive audit.

25. KMA conducted a second audit of CRS on May 20–22, 1988 ("the Second Audit"). The Second Audit consisted of a review by KMA of all of the 866 open files maintained by CRS.

26. KMA issued a report of the Second Audit, which was undated, and a supplemental letter dated June 27, 1988, detailing its findings from the Second Audit ("the Second Report"). KMA expressed the following concerns regarding CRS' claims handling: (a) insufficient settlement activity; (b) inconsistent and "inappropriate" reserving practices; (c) missing documentation, such as motor vehicle checks; (d) inadequate file accounting system; (e) insufficient evidentiary investigation; (f) erroneous claim payment; (g) no standard diary system; and (h) poor file condition. See Plaintiff's Exhibit 17. There is no evidence that either the First or the Second Report, or their contents, were disclosed to CRS at any time prior to the initiation of the adversary proceeding.

27. In April or May, 1988, the Debtor began negotiations with United Fire Insurance Co. ("United Fire") for United Fire to become the Debtor's conventional liability insurer.

28. On or around May 18, 1988, the same time period in which KMA was performing its First and Second Audits of CRS, Somerman and MacDonald attended a meeting with United Fire. MacDonald supposedly attended the meeting to interpret

loss run information contained on CRS' computer disc provided to the Debtor, but we find that, in addition, Somerman and MacDonald contemplated KMA's becoming a TPA under the United Fire policy and replacing CRS' role as TPA in the self-insurance program with KMA, and therefore wished to introduce United Fire to KMA.

29. On May 20, 1988, the Debtor filed a Motion with this court to appoint KMA as the TPA under the United Fire conventional insurance policy, which was to become effective June 1, 1988. The court entered an Order so appointing KMA on May 26, 1988.

30. Although CRS never contracted with the Debtor to perform claims handling under the Debtor's conventional insurance plan, CRS assumed that the Debtor would contract with it to handle claims under any conventional insurance plan into which the Debtor would enter.

31. Despite the Debtor's denials, we find that, even prior to receipt of KMA's First and Second Reports, the Debtor had decided to terminate CRS.

32. Although neither the Debtor nor Debtor's counsel told KMA what conclusions it should reach in the First or Second Reports, it is clear that KMA's interest in replacing CRS as TPA and the Debtor's decision to effect this replacement before receipt of the Reports tainted the objectivity of the First and Second Reports.

33. On June 8, 1988, when the Debtor was prepared to effect its intention to eliminate CRS as its TPA, CRS, which had not been informed of the contents of the Reports, was suddenly asked to resign as TPA under the Debtor's self-insurance plan. When CRS refused to voluntarily resign, it was terminated by letter dated June 23, 1988, from the Debtor's counsel, pursuant to the terms of the CAA. In a letter to CRS of July 14, 1988, the Debtor's counsel indicated that he considered the termination of CRS as the Debtor's TPA to be effective as of July 17, 1988.

34. KMA was first officially approached about becoming CRS' successor TPA under the Debtor's self-insurance program in July, 1988. However, as noted above, we find that KMA and the Debtor had considered entering into this relationship prior to the Debtor's termination of CRS.

35. Accordingly, KMA and the Debtor executed an agreement which KMA would become the Debtor's TPA for its self-insurance program on August 22, 1988. By Order dated September 28, 1988, this court approved the appointment of KMA as TPA under the self-insurance program.

36. The aspect of the Debtor's self-insurance program which was of primary significance to it was the level of cash contributions which it was required to submit into the claims escrow account under the self-insurance program, because the Debtor constantly experienced cash-flow deficiencies subsequent to the bankruptcy filing. The level of contributions required depended upon the amount of reserves established by its TPA. Thirty (30%) percent of the Debtor's budget of expenditures was devoted to making the necessary payments into the escrow account.

37. The Debtor, therefore, had a very significant interest in keeping the reserves low. Most of the friction between CRS and the Debtor, per its Vice–President in charge of operations, Robert Seaner ("Seaner"), was caused by Seaner's belief that CRS was pegging the reserves too high and was constantly and improperly changing the reserves on individual claims, usually adjusting them upward.

38. The Debtor's perceived need to maintain lower and more stable reserves, in combination with the contention that CRS failed to provide information to it in timely fashion, was the strongest motivating factor in the Debtor's desire to replace CRS as its TPA.

39. KMA provided the Debtor with the comfort which it desired by concluding that CRS had maintained the Debtor's reserves too high. There was no evidence that KMA's presence as TPA resulted in any significant changes in the Debtor's reserving practices, however, once it became the TPA.

40. Subsequent to the initiation of this lawsuit, and obviously solely in preparation

for trial of this proceeding, the Debtor hired a highly reputable firm, Tillinghast, a Towers Perrin Co. ("Tillinghast"), to evaluate CRS' work-product.

41. Several of the findings of KMA, which were supported by Tillinghast's ultimate report, have merit. Specifically, they both found that CRS failed to maintain its files in a neat and orderly fashion, failed to consistently pursue settlement and subrogation claims, failed to consistently provide the Debtor with monthly loss-runs, delegated claims practices to personnel far less experienced than Sherman, and that Sherman and the other supervisory personnel of CRS failed to consistently supervise this personnel.

42. John J. Bennett ("Bennett") of Tillinghast, who performed the Tillinghast report, found, however, that CRS' reserves were generally set far too *low*. This finding, directly contrary to KMA's finding on perhaps the most significant bottom-line aspect of CRS' work-product, its maintenance of reserves, suggests that KMA's Reports were not very accurate nor objective.

43. Throughout the trial, the Debtor's witnesses reiterated the practical difficulties to the Debtor in switching TPA's, presumably to emphasize the perceived severity of malfeasance by CRS. However, on March 28, 1990, we approved an expedited motion, filed by the Debtor on March 19, 1990, to replace KMA with a new entity, Atlantic States Adjustment, Inc. ("ASA"), as TPA, because Donald G. Flynn, the claims manager of KMA during its engagement with the Debtor, had left KMA to form ASA.

## D. CONCLUSIONS OF LAW

1. CRS must comply with the standard of professional conduct for TPA's.

2. The standard of care required of professionals generally, which we find applicable to CRS' engagement as the Debtor's TPA, is established in 2 RESTATEMENT (SECOND) OF TORTS, § 299A, at 73 (1965) ("the Restatement"), which has been adopted by Pennsylvania courts and states as follows:

Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

3. Expert testimony is necessary to establish CRS' compliance or non-compliance with the standard of care applicable to a TPA.

4. The Debtor failed to establish, by a preponderance of the evidence, that CRS violated the standard of care applicable to a TPA.

5. The CAA is a contract between CRS and the Debtor.

6. The Debtor failed to show that CRS breached the terms of the CAA.

7. CRS owed a fiduciary duty to the Debtor. Its fiduciary duty arose out of its relationship as an adjuster-like agent of the Debtor.

8. The Debtor failed to show that CRS breached this fiduciary duty.

## E. DISCUSSION

### 1. THE DEBTOR FAILED TO ESTABLISH THAT CRS WAS GUILTY OF MALPRACTICE.

a. *CRS Must Comply With the Standard of Professional Conduct Applicable to TPA's.*

In order to prevail on its claim of professional malpractice against CRS, the Debtor bore the burden of proving the following, by a preponderance of the evidence: (1) the duty of CRS to the Debtor; (2) a breach of that duty; and (3) that the breach was a substantial factor in causing damages to the Debtor. *See, e.g., In re Direct Satellite Communications, Inc.,* 96 B.R. 507, 515–16 (Bankr.E.D.Pa.1989).

The duties of CRS to the Debtor arise from the professional standard of conduct for TPA's and the CAA. The professional standard of conduct for TPA's is not readily ascertainable. It can, however, be extrapolated from the Pennsylvania Unfair In-

surance Practices Act, 40 P.S. § 1171.1, *et seq.* ("UIPA"), and the standards of conduct for other professionals.

■ The UIPA was expressly incorporated into the CAA by reference. The purpose of the UIPA is to regulate practices in the insurance industry. 40 P.S. § 1171.2. Certain persons, including brokers and adjusters, are prohibited by the UIPA from engaging in any trade practices which are unfair or deceptive, as defined by 40 P.S. § 1171.5. 40 P.S. § 1171.4. An "adjuster" under the UIPA, which is very close to the role of a TPA, is a person who represents an insurance company in settling a loss with an insured and does not represent the insured. *Culbreth v. Lawrence J. Miller, Inc.*, 328 Pa.Super. 374, 384, 477 A.2d 491, 497 (1984).

■ The goal of the UIPA is to protect the public from nefarious insurance sales schemes, opportunistic salespersons, and insurance companies unwilling to defend their insureds. The requirements for compliance with the UIPA include proper representation of facts, prompt action, reasonable (to the claimant) standards for investigation of claims, good faith (to the claimant) and reasonable settlement practices, effecting fair settlements in lieu of compelled litigation, maintaining clear purposes in effecting settlements, making claimants aware of options, and truthfulness to all parties in performance of duties. *See* 40 P.S. § 1171.5.

■ Insofar as it relates to insurance adjusters, the UIPA mainly addresses the duties of an adjuster as to a claimant. The UIPA does not evince a purpose to protect an insurer from the practices of its adjusters, nor does it discuss directly the duty of the adjuster to an insurer. Certain requirements of the UIPA, however, also appear to apply to the adjuster-insurer relationship, which is very close to the relationship between CRS and the Debtor. These include the requirements of responsiveness, reasonable investigation of liability, effectuation of prompt and equitable settlements, and truthfulness. The satisfaction of these requirements should be among the accomplishments of a competent adjuster.

The failure of an adjuster to fulfill these requirements and others under the UIPA can lead to the assessment of administrative penalties against the insurer under the UIPA. 40 P.S. §§ 1171.9, 1171.10. An adjuster, therefore, has an implicit duty to comply with the provisions of the UIPA in order to protect the insurer from liability.

■ In the absence of the statement of a specific professional standard of care for TPA's to insurers in the UIPA, we must also look to the standard of care required of professionals generally as set forth in the Restatement, at § 299A, and as thusly stated in a recent Pennsylvania court decision:

> Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

*Robert Wooler Co. v. Fidelity Bank*, 330 Pa.Super. 523, 531–32, 479 A.2d 1027, 1031 (1984). This means, for example, that an architect's client has the right to regard an architect as skilled in building construction science and to expect that party to use the reasonable and ordinary care and diligence evidenced by other architects in the same or similar locality. *Bloomsburg Mills, Inc. v. Sardoni Construction Co.*, 401 Pa. 358, 361, 164 A.2d 201, 203 (1960). Similarly, a physician who is not a specialist is required to possess and employ the skill and knowledge usually possessed by physicians in the same or similar locality in the treatment of a patient. *Incollingo v. Ewing*, 444 Pa. 263, 281–82, 282 A.2d 206, 213 (1971), citing *Donaldson v. Maffucci*, 397 Pa. 548, 553–54, 156 A.2d 835, 838 (1959).

Accountants have been held to the standard of care similar to the standard set forth in Section 299A of the Restatement. *Wooler*, 330 Pa.Super. at 532, 479 A.2d at 1031. "In the absence of specific language relieving it from acts of negligence, [a contract] did not relieve [the accountant] from acts of negligence, [and] did not relieve it

from liability for ignoring suspicious circumstances which would have raised a 'red flag' for a reasonably skilled and knowledgeable accountant." *Wooler*, 330 Pa.Super. at 533, 479 A.2d at 1032. Thus, in *Wooler*, when an accounting firm agreed to provide unaudited accounting services, it was held to further undertake to exercise the degree of accounting skill possessed by other accountants in the community and it was required to be alert for control defects which were patently obvious and which could lead to defalcations by a dishonest employee.

In attorney malpractice cases, Pennsylvania law employs a similar standard. To prove attorney malpractice, the following elements must be established:

1. The employment of the attorney or other basis for duty;

2. The failure of the attorney to exercise ordinary skill and knowledge; and

3. That such negligence was the proximate cause of damage to the plaintiff.

*Direct Satellite, supra*, 96 B.R. at 515–16. *Accord, Rizzo v. Haines*, 520 Pa. 484, 499, 555 A.2d 58, 65 (1989).

A few cases discuss the standard of care which arises among the parties to an insurance contract. Most closely on point is *Consolidated Sun Ray, Inc. v. Lea*, 401 F.2d 650, 656 (3d Cir.1968), *cert. denied*, 393 U.S. 1050, 89 S.Ct. 688, 21 L.Ed.2d 692 (1969), which quotes in part from *Talley v. Hoffman*, 18 D. & C.2d 725, 729 (Lycoming Co.C.P.1959), as follows in describing the standard of care to which an insurance broker is required to conform in performing services for an insured party:

"[A]n insurance broker is under a duty to exercise the care that a reasonably prudent businessman in the brokerage field would exercise under similar circumstances...." An insurance broker is the agent of the insured ... and carries a duty to his principle to exercise reasonable skill, care, and diligence in effecting insurance.... He is charged with the exercise of reasonable care and skill in making inquiries and obtaining informa-

tion concerning the responsibility of the insurer with whom they place [sic] the risk, and is liable for any loss occasioned by such want of care....

Other cases, addressing the standard of care imposed upon an insurer in its relationship with its insured, *Gedeon v. State Farm Mutual Automobile Ins. Co.*, 410 Pa. 55, 58–59, 188 A.2d 320, 322 (1963), and of an adjuster employed by an insurer to an insured party, *Diamon v. Penn Mutual Fire Ins. Co.*, 247 Pa.Super. 534, 551, 372 A.2d 1218, 1227 (1977), emphasize that the insurer and its adjuster assume a fiduciary position which obliges them "to act in good faith and with due care in representing the interests of the insured."

■ The instant case appears to be unique in presenting a situation in which an insurer is asserting a cause of action against its adjuster or agent even though no claimant has asserted any claim against the insured. The lack of any averment that CRS' conduct resulted in the creation of any unjustified liability of the Debtor-insurer to an insured or to any other party is, ultimately, a factor which causes us to question the viability of the Debtor's claim. See pages 889–90 *infra*. However, addressing only the issue of the standard of care, these insurance-industry cases suggest that the agents of an insured do indeed have an obligation to adhere to a standard of care in performing their duties, similar to those imposed upon other professionals.

The Debtor and CRS, despite an alternative argument by the latter that no professional standard of care applicable to TPA's exists, agree in their trial briefs that the standard articulated in *Wooler, supra*, has been uniformly adopted by the courts of this Commonwealth as the standard of care of professionals to their principals generally and is applicable in the instant matter. We therefore find that this standard is the proper standard of care for TPA's and must be adhered to by CRS in the performance of its duties for the Debtor.

b. *Expert Testimony is Necessary to Establish CRS's Non–Compliance with the TPA Standard of Care for TPA's.*

■ We have held that expert testimony is required as an element of proof in all but

the very simplest malpractice cases. *Direct Satellite*, 96 B.R. at 517. *But see Rizzo, supra*, 520 Pa. at 501–03, 555 A.2d at 66–68 (expert testimony not needed where the issues are not beyond an average person's knowledge). Further, the Pennsylvania Supreme Court has held that expert testimony is usually necessary to establish negligent practice in any profession. *Powell v. Risser*, 375 Pa. 60, 65, 99 A.2d 454, 456 (1953). In light of this precedent and the complexities of the instant case, we find that expert testimony is necessary to determine whether CRS failed to comply with the standard of care applicable to a TPA.

c. *Even Though the Debtor's Expert Was Competent, the Debtor Failed to Establish That CRS Violated the Standard of Care Applicable to a TPA.*

The Debtor called Bennett, of Tillinghast, as its expert witness. Tillinghast is a corporation engaged in the business of management, risk management, and actuarial and insurance claim consulting. Bennett is an attorney and an insurance underwriter who has been employed by Tillinghast as an insurance-claim consultant for approximately two years. While at Tillinghast, Bennett has performed over forty claims audits, including several audits of businesses handling automobile claims similar to those handled by CRS. In fact, Bennett described automobile claims handling as his "forte." Transcript IV, at 17.

Bennett's audit of CRS' files took eight (8) days. Due to the contentious relationship of the Debtor and CRS at that time, Bennett did not speak to anyone from CRS as part of his audit. Bennett reviewed CRS' claim-reserving and settlement activities, the CAA, and 147 files which, according to a statistical analysis by Bennett which was undisputed by CRS, constituted a one hundred (100%) percent sample of the files which CRS opened and closed with an indemnity payment. In addition, he reviewed additional seventy-eight (78) random files not in the category of these 147, for a total of 225 files. Bennett concentrated on files closed by CRS in order to permit his analysis to emphasize only those cases which CRS handled completely, from start to finish. Bennett testified that he was positive that the files that he had reviewed had been handled solely by CRS and not altered by KMA.

Bennett described the procedures which, in his opinion, equate to proper automobile claims handling as follows:

> [W]hat would be most essential is prompt assignment, prompt and proper investigation, prompt proper evaluation leading to an accurate case reserve. Aggressive negotiation and then proper settlement. All of this reflected in the development and gathering of accurate claim records and statistics. And that basically does it, as well as a process of thorough and consistent supervision and management. There's really no one set standard or that this isn't written in a book or in a set of procedures anywhere, but this [is the] kind of process that you generally find in all successful claim handling operations. And all insurance companies have their own manuals and procedures that set forth this kind of thing.

Transcript IV, at 30.

Bennett concluded from his audit that CRS' claim-handlers were inexperienced; that they therefore handled more files than they were able to service adequately and that they were incapable of making judgments concerning comparative negligence; that general file maintenance, organization and documentation were poor and contained no evidence of a set claims-handling procedure; that supervision of the claims-handlers was inadequate; that investigations were often inadequate or incomplete; that no-fault claims and settlements were handled poorly; that viable subrogation opportunities were not pursued; that the closing ratio maintained by CRS, sixty-four (64%) percent, was poor; and that the litigation files were "totally out of control." Further, Bennett concluded that the reserves were "unusually alarmingly low," although he found no evidence that the reserves were intentionally depressed. *See generally id.* at 30–59.

In Bennett's opinion, the services performed by CRS generally failed to meet the minimum standards in the claims-handling business, and did not satisfy the obligations of CRS to the Debtor under the CAA. *Id.* at 53–54.

Bennett did concede that the claims handled by CRS were fairly complicated and required a "level of evaluation and claim handling expertise and experience ... to perform the judgmental functions needed and the valuative functions needed in auto [bodily injury claims]." *Id.* at 205.

CRS also called an expert witness, A. Andrew Tignanelli ("Tignanelli"). Generally, Tignanelli, was not as persuasive as Bennett. Initially, Tignanelli denied that there was an industry standard of care for TPA's, but later testified that, if there were such a standard, CRS complied with it. Transcript V, at 88. Tignanelli reviewed only 53 files, the handling of which Bennett had previously characterized as "very poor." Tignanelli concluded that these files were not "grossly out of line." *Id.* at 116. Rather, he emphasized that establishing reserves and making settlements are subjective processes and that "claims people have a notorious habit of going from one extreme to the other." *Id.* at 98. Tignanelli further testified that, while communication between the CRS' claims-handlers and supervisors was lacking, the results obtained by CRS were good. *Id.* at 96. He concluded that CRS conducted adequate investigations, *id.* at 111; adequately pursued subrogation, *id.* at 114; adequately pursued settlements, *id.* at 115; and employed an adequate staff. *Id.* at 117. However, Tignanelli admitted, under cross-examination, that, if Tillinghast's findings were correct, the Debtor would have been justified in terminating its contract with CRS. *Id.* at 196.

In finding Bennett's testimony to be more persuasive than Tignanelli's, we compared not only the methodology used by both experts, but also their individual qualifications. While Bennett, on cross-examination, revealed that he was not familiar with the UIPA or the Pennsylvania procedures which must be followed to obtain a default judgment, he has personally performed over 40 audits of TPA's, including numerous small TPA's, such as CRS, around the country. Meanwhile, Tignanelli's engagement here was the first audit of a small TPA that he had ever performed and much of his experience was as a claims-handler rather than as a claims-handling consultant. Balancing all of the relevant considerations, we give more weight to Bennett's conclusions than to Tignanelli's.

▮ Even so, we conclude that the Debtor failed to establish that CRS has violated the TPA standard of care articulated earlier in this Opinion. *See* pages 883–85 *supra.*

As illustrated in the following disclaimer appearing at page 2 in Tillinghast's report, Tillinghast, per Bennett, was unable to articulate a definite standard of care for TPA's:

> Because of the unpredictability and variability inherent in the claim handling process, I cannot guarantee that Metro's claim evaluations, reserves or settlements, are or will be accurate, adequate or reasonable with regard to their ultimate disposition.

The same report stated, at page 4:

> We have found no one standard or method governing the claim handling process, and we are not aware of a single set of requirements governing the handling of claims.

Applying the standard of care adopted by this court to Bennett's findings, we conclude that, while CRS clearly did not provide exemplary claims-handling services to the Debtor, it did not violate the standard of care applicable to a TPA. Several factors lead to this conclusion. First, in numerous respects, Bennett's testimony was inconclusive. His expertise was limited by his lack of familiarity with Pennsylvania insurance practices; with Pennsylvania law regarding claims handling and subrogations; and with the Debtor's bankruptcy procedures for acquiring claims settlement approval. As a result, he provided inconsistent testimony regarding the complexity of the CRS cases and failed to de-

finitively establish any industry standards which had been violated by CRS.

Bennett reported that CRS was slow in closing files and making settlements. However, since he was unfamiliar with the Debtor's bankruptcy mechanisms regarding paying claims and making settlements, Bennett was unable to state whether the delays he discovered were due to the bankruptcy mechanisms or to CRS' performance.

Bennett found several practices of CRS to be objectionable due to his experiences in California and Massachusetts. However, Tignanelli, who is familiar with local TPA practice, testified that many of the "problems" in the CRS files identified by Bennett were actually not problems, but were, instead, procedures consistent with TPA practices in the Philadelphia area, usually for good reasons. For example, Bennett identified the absence of motor vehicle reports in many of the CRS files as a deficiency in CRS' claims-handling procedure. Tignanelli, however, testified that motor vehicle reports are not required in every case and that, from his experience, it is not unusual to find files of local claims agents which contain no such reports.

■ Both experts agreed that the process of setting reserves is a very subjective one. Bennett, during his review of CRS' closed files, was in the enviable position of being able to employ perfect 20/20 hindsight. It is quite simple to compare reserves for certain claims with the payments actually made and conclude that these numbers do not always match. While CRS' reserves were often inconsistent with the payments actually made when accounts were closed, we do not find that they were so extremely erratic as to warrant a finding that CRS violated its professional duty of care to the Debtor.

In Findings of Fact 36–39 and 42, pages 882 and 883 *supra,* we noted the significance of the level of reserves to the Debtor's ability to fund its self-insurance plan and the contrast between Bennett's faulting CRS for reserves that are "unusually, alarmingly low," and KMA's conclusion that the reserves set by CRS were too high.

■ Also, we note that Somerman criticized CRS for changing reserves too frequently. Somerman's skepticism about the propriety of these changes in reserves was articulated by him as the primary reason for the Debtor's desire to obtain a peer review of CRS' activities in the first place. In response, Sherman testified that the files were reviewed every thirty days in order to make adjustments to the reserves as were necessary. Both KMA and Bennett criticized CRS' reserve practices because they believed that not enough changes were made. These opinions suggest that Somerman's original criticism of CRS was unjustified. We are also reluctant to conclude, in light of these diametrically conflicting views as to the propriety of the frequency with which CRS changed reserves, that CRS' practices in this regard were deficient.

■ There was no evidence that routine claims were not properly processed. Bennett's comments regarding routine claims processing was limited to allegations of poor file-jacket organization, inadequate maintenance of file histories, and insufficient record-keeping. However, CRS, through Sherman, presented testimony that the condition of CRS' files were as good as and even better than the files that he had maintained while employed by the Debtor in prior years. This assertion was conceded by Somerman, who stated that CRS' files were neater than when the files had been maintained by the Debtor itself. Seaner, who handled the Debtor's day-to-day interactions with CRS, admitted that the claims were handled the same as when Sherman had worked in-house with the Debtor. Both Somerman and Seaner testified that they would have been satisfied if CRS had handled the claims as well as Sherman had done when employed by the Debtor. From this testimony, we conclude that CRS' handling of routine claims was adequate.

Bennett also found fault with CRS for failing to adequately develop claim files under processing. To some degree, this position has merit. Both the KMA audit

and Bennett's audit revealed inconsistent diary-entry methodology by CRS. There was little use by CRS of standard forms, police reports were sometimes lacking in disputed liability claims, and CRS' letters assigning cases to counsel for litigation were often non-existent. Motor vehicle reports were not always obtained to determine whether the claimant had concurrent no-fault coverage.

On the other hand, Sherman contended that the lack of complexity of many of the files, CRS' practice of making notes on the file jackets, and its use of a computer system provided an adequate file history. Sherman further testified that standard forms were used when appropriate, police reports were sought as needed, and informal communications met the needs of litigation counsel. Testimony was given that Pennsylvania no-fault laws require payment within 30 days, good faith notwithstanding, thereby making a wait for motor vehicle reports impossible prior to payment even though such reports might otherwise indicate that non-payment of certain claims would be justified.

Bennett also provided testimony that CRS had consistently failed to pursue subrogation rights. While specific files where potential subrogation rights of the Debtor were allegedly not pursued were identified, CRS responded, with apparent justification, that successful pursuit of subrogation required the Debtor's cooperation in providing information, which was frequently not forthcoming.

The Debtor may have been able to meet its evidentiary burden if it had shown that CRS was guilty of either a failure to be alert to suspicious circumstances, a failure to comply with specific claims processing procedures provided in the CAA, or a specific failure to comply with the UIPA, thereby subjecting the Debtor to liability to

claimants or to administrative penalties. However, Bennett's testimony failed to establish any of these matters.

Bennett offered no testimony regarding any specific circumstances which should have generated particular cause for alarm on the part of a TPA. Other than general criticisms of CRS' practices, Bennett did not find that CRS had failed to respond to any abnormalities in the claims process which should have flagged the attention of an alert TPA. In fact, CRS offered unrefuted testimony that its agents had flagged a shortfall in the funding of the escrow account against the reserves and brought this to the attention of counsel for the Committee.[2]

Furthermore, Bennett offered no testimony relating to violations of specific terms of the CAA other than to testify that, in his opinion, CRS had not complied with the terms of the CAA.

Finally, Bennett provided no testimony, and there was no other evidence presented, that the Debtor faced any potential liabilities to claimants or any other parties as a result of CRS' failure to comply with the UIPA or any other act on CRS' part. This failure is a significant distinction between the facts of *Consolidated Sun Ray, supra,* and *Diamon, supra,* where an insurance broker and an insurance adjuster, respectively, were found accountable for the failures of claimants to make recoveries from the insurers to which they were allegedly entitled.

We are struck, here, by the failure of the Debtor to allege, even in general terms, adverse consequences which ensued to claimants against it or to itself as a result of the CRS' malfeasance or nonfeasance. The only area in which any damages to the Debtor as a result of CRS' actions was

---

**2.** In fact, Sherman contended that this act on his part, which he claimed that the Debtor viewed as a threat to its continued maintenance of the self-insurance program, was actually the primary reason that the Debtor sought its replacement. We find a strong possibility of merit in this contention. While the Debtor was required to hire a TPA which was independent, in order to avoid its manipulation of the re-

serves in the self-insurance program, it was obvious that the Debtor was reluctant to allow independence to flourish. We suspect that CRS was hired because the Debtor perceived that Sherman's prior employment with it would enhance its control over the TPA's performance of duties. At the first instance of real independence, CRS was discharged.

alleged was a claim that the Debtor was burdened with additional costs as a result of its replacing CRS with KMA and the Debtor's being compelled to pay KMA to duplicate work already done by CRS. While we agree with the Debtor's contention that it had a right to discharge CRS, see pages 891–92 *infra,* such damages obviously resulted from the Debtor's own choice to switch TPA's. From the Debtor's filing of the adversary proceeding only as a reaction to CRS' motion for compensation, through the completion of the trial, we were left with the firm impression that this proceeding was filed merely to attempt to justify the dismissal of CRS in light of the lack of any prior warnings or any hard evidence of cause on the part of the Debtor for doing so. Also, it should be recalled that we concluded, at Findings of Fact 31–32, at page 882 *supra,* that the KMA Reports which were the basis of the Debtor's discharge of CRS were tainted by KMA's conflict of interests. Bennett's more objective evaluation was the product of a post-litigational effect to justify what had already been done precipitously.

It is difficult to be receptive to claims filed for reasons which appear retaliatory and were conceived mainly to justify past doubtfully-prudent conduct of a client in discharging a professional, as opposed to claims filed because of firm evidence that malpractice of the defendant was the direct cause of damages inflicted solely by the professional and not as a result of the client's own choices.

Consequently, we conclude that the Debtor has failed to show, by the requisite preponderance of the evidence, that CRS violated its duty to perform its duties as a TPA. Therefore, the Debtor cannot prevail in its action for professional malpractice against CRS.

## 2. THE DEBTOR FAILED TO SHOW THAT CRS BREACHED THE CAA.

■ Since the Debtor has failed to establish that CRS violated its professional duty to the Debtor, the Debtor's claim that CRS is guilty of negligence is foreclosed and its claim that CRS breached the CAA is severely weakened. Under Pennsylvania law, a broker's conduct is measured by the same standard irrespective of whether a claim is made against him in negligence or for breach of contract. *Consolidated Sun Ray, Inc. v. Lea,* 276 F.Supp. 132, 136 (E.D.Pa.1967), *aff'd, Consolidated Sun Ray, supra.* Similarly, the standards for determination of whether CRS' performance constituted professional malpractice or a breach of a contract to perform professional services cannot be differentiated.

■ The Debtor argues that CRS breached the CAA in that CRS (1) failed to adequately supervise the work done by its staff; (2) failed to conduct adequate and complete investigation of the claims against the Debtor; (3) made erroneous judgments in setting reserves; (4) made duplicate and improper payments; (5) failed to properly handle and pursue subrogation cases; (6) maintained its claim files and recordkeeping poorly; and (7) failed to adequately supervise the services of independent counsel retained to litigate certain claims.

It is noteworthy that, at the time that the Debtor terminated the CAA, the contractual failing of CRS which was highlighted and which allegedly prompted the KMA audits was the failure of CRS to timely supply copies of monthly loss-runs. However, this contention was not listed among the alleged breaches of the CAA recited in the last paragraph which were emphasized at the time of and subsequent to the trial.

The CAA provides that CRS shall have "sole discretion" in handling the Debtor's claims, presumably to assure its independence from the Debtor in performing this duty in light of the Debtor's incentive to keep reserves as low as possible at all costs. But see page 889 n. 2 *supra.* CRS handled the Debtor's claims in a manner which we have found did not violate its professional duty of care. We conclude, therefore, that the Debtor failed to establish that CRS breached the CAA.

## 3. THE DEBTOR FAILED TO SHOW THAT CRS BREACHED ITS FIDUCIARY DUTY TO IT.

■ "Under Pennsylvania law, the duty of an agent to his principal is one of loyalty

in all matters affecting the subject of his agency and the agent must act with the utmost good faith in the furtherance and advancement of the interests of his principal." *Garbish v. Malvern Federal Savings & Loan Ass'n*, 358 Pa.Super. 282, 296, 517 A.2d 547, 554 (1986), *appeal denied*, 516 Pa. 641, 533 A.2d 712 (1987), citing *Sylvester v. Beck*, 406 Pa. 607, 178 A.2d 755 (1962). Pennsylvania law recognizes a cause of action for breach of fiduciary duty. *American Standard Life & Accident Ins. v. U.R.L., Inc.*, 701 F.Supp. 527, 540 (M.D.Pa.1988). In fact, the insurance-oriented "malpractice cases" cited at pages 884–85 *supra*, *Consolidated Sun Ray, Gedeon*, and *Diamon*, are technically based on claims of breaches of fiduciary duties by the respective defendants.

 As in a malpractice claim, the standard of care imposed on the fiduciary depends on whether or not the fiduciary is or claims to be an expert in the area to which his fiduciary duty relates. *Garbish, supra*, 358 Pa.Super at 296, 517 A.2d at 554. When the fiduciary acquires his undertaking based upon a skill he possesses which is allegedly beyond that possessed by an ordinary prudent person, he is to be judged by the standard of his claimed skill level. *Id.*

 CRS, in its role as a TPA, served in a role very similar to that of an insurance adjuster for the Debtor. "An adjuster does not discharge functions of a quasi judicial nature, but represents his employer, to whom he owes faithful service." 45 C.J.S. 1229 (1946). Thus, a claim against a TPA for breach of a fiduciary duty is the basic equivalent of a claim of malpractice against the TPA.

 Our conclusion that the Debtor was unable to prove that CRS was guilty of malpractice therefore requires us to conclude that the Debtor was also unable to prove that CRS breached its fiduciary duties to the Debtor. Therefore, we find that the Debtor has failed to prove that CRS breached a fiduciary duty to it.

4. CRS IS NOT ENTITLED TO PREVAIL ON ITS COUNTERCLAIMS, EXCEPT TO THE EXTENT THAT IT IS ENTITLED TO BE COMPENSATED FOR SERVICES PERFORMED PRIOR TO ITS TERMINATION AS TPA.

We noted, at page 878 *supra*, that the parties, and notably CRS, devoted little attention in post-trial submissions to CRS' counterclaim and motion for compensation. We believe that this lack of attention was due to a perception by both parties that these claims were far simpler to resolve than the validity of the claims of the Debtor against CRS. Indeed, this is so.

 Despite our conclusion that the Debtor failed to sustain its claim, we rather easily find that CRS may not proceed on its claim for wrongful termination. Paragraph 16(e) of the CAA, *see* Findings of Fact 12, page 880 *supra*, clearly permits the Debtor to terminate the CAA if *it* finds that CRS has not adequately performed its duties thereunder. It is apparent that the Debtor felt that CRS has not adequately performed under the CAA. While the evidence did not rise to the level of proving malpractice on the part of CRS, the evidence did establish that CRS performed its services in less than exemplary fashion. Apparently, CRS and the Debtor negotiated paragraph 16(e) of the CAA to provide the Debtor with complete power to dismiss or retain its TPA as well as to provide it a high level of comfort regarding its claim-handling, see page 889 n. 2 *supra*, and CRS voluntarily agreed to this, among the conditions of its employment. We add that Bennett, particularly, was convincing in establishing that CRS was deficient, to a considerable degree, in the performance of its duties as the TPA. See pages 886–87 and 887 *supra*.

We do agree that CRS is entitled to most of the compensation sought in its motion requesting same and its counterclaim. We found, at Finding of Fact 33, page 882 *supra*, that CRS was effectively terminated as the Debtor's TPA on July 17, 1988, after the performance of all of its services for which compensation is sought in the

"motion" for compensation. CRS is therefore entitled to compensation for all services performed as TPA recited in that motion, which apparently do not extend beyond the end of the day of July 17, 1988.

 However, the motion seeking compensation of $69,303.54, plus interest, from the assets of the Debtor's estate, cannot be sustained in its entirety. We find valid the Committee's Objection to the request of CRS for compensation for closing cases in which services were not totally completed, but which were merely returned to the Debtor for subsequent servicing to completion by KMA, as CRS's successor. We also decline to allow CRS any interest for delays in receipt of its compensation. The CAA does not expressly provide for payment of interest for delay in payment of compensation. The delay in payment was attributable, in large part, to this court's own perception that the claims of malpractice set forth by the Debtor in this proceeding, which we reject but clearly decline to characterize as frivolous, had to be resolved before payment could be authorized.

We will permit CRS to submit a revised Application for compensation, in accordance with the guidelines set forth in this Opinion, on or before May 5, 1990. We will then allow the Debtor and the Committee until May 12, 1990, to submit comments or objections in response to this Application. We then anticipate entering an award in favor of CRS without the need for a further hearing. ·

F. CONCLUSION

We will enter an Order consistent with the conclusions reached in this Opinion.

ORDER

AND NOW, this 23rd day of April, 1990, after a five-day trial and upon consideration of the parties' respective post-trial submissions relevant to the above-captioned adversary proceeding and the "motion" of the Defendant therein in the Debtor's main bankruptcy case for compensation, it is hereby ORDERED and DECREED as follows:

1. Judgment is entered in favor of the Defendant, CONTROLLED RISK SERVICES, INC., and against the Plaintiff, METRO TRANSPORTATION CO., d/b/a YELLOW CAB COMPANY on all claims set forth in the adversary complaint.

2. Judgment is entered in favor of the Plaintiff on all counterclaims asserted by the Defendant in the adversary proceeding except those counterclaims which are the equivalent of the requests set forth in CRS' motion for compensation.

3. The Defendant shall file and serve, upon the Debtor, the Official Unsecured Creditors' Committee, the United States Trustee, and the court in chambers, an amended Application for Compensation, consistent with the guidelines set forth in the foregoing Opinion, on or before May 5, 1990.

4. The Debtor, the Official Unsecured Creditors' Committee, and the United States Trustee shall file and serve upon each other, CRS, and the court in chambers, any objections or responses to the aforesaid Application on or before May 15, 1990.